05-057

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 110

OUR LADY OF THE ROCKIES, INC.,
a Montana non-profit corporation,

      Plaintiff and Appellee,

   v.

KENT PETERSON, KATHLEEN A. PETERSON,
LISLE WOOD, PAULINE WOOD, n/k/a PAULINE
THOMAS, JONATHAN B. CLARK, VIDGIS J. CLARK,
JEFFREY A. BECKETT, JEANNINE A. STALLINGS,
JENNIFER A. KOCHEL and JILL A. JOHNS,

      Defendants and Appellants.

APPEAL FROM:   District Court of the Second Judicial District,
In and For the County of Silver Bow, Cause No. DV 03-208
Honorable Thomas M. McKittrick, Presiding Judge

COUNSEL OF RECORD:

     For Appellants:

          Gregory G. Schultz, Law Offices of Gregory Schultz, P.C., Missoula,
Montana

          Shane A. Vannatta, Worden Thane, P.C., Missoula, Montana

     For Appellee:

          J. Richard Orizotti, Poore, Roth & Robinson, P.C., Butte, Montana

Submitted on Briefs:  January 16, 2008

Decided:  April 1, 2008

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Kent Peterson, Kathleen A. Peterson, Lisle E. Wood, Pauline P. Wood (now known as Pauline P. Thomas), Jonathan B. Clark, and Vidgis J. Clark[1] (collectively, "Landowners") appeal from the order of the District Court for the Second Judicial District, Silver Bow County, granting partial summary judgment in favor of Our Lady of the Rockies, Inc. ("OLR"). We reverse.

¶2 The parties raise a number of issues related to the easement at issue here; however, the dispositive question on appeal is as follows: Did the District Court err in concluding that the federal government expressly reserved a public road across the Landowners' properties by referring in an 1896 federal land patent to a mineral survey that depicted a road labeled "ROAD"?

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Overview of Patenting Under the General Mining Act of 1872

¶3 A brief overview of the process of securing a patent to a mining claim is helpful in understanding the facts and issues of this case. Under the General Mining Act of 1872,[2] a private citizen may enter federal lands to explore for valuable mineral deposits. *California Coastal Com'n v. Granite Rock Co.*, 480 U.S. 572, 575, 107 S. Ct. 1419, 1422 (1987). If a valuable mineral deposit is located, a mining claim may be filed for a lode or

---

[1] Jeffrey A. Beckett, Jeannie A. Stallings, Jennifer A. Kochel, and Jill A. Johns— who appeared with the Petersons, the Woods, and the Clarks as defendants in the District Court—did not file notices of appeal and are not parties to this appeal.

[2] Act of May 10, 1872, ch. 152, 17 Stat. 91, *codified at* R.S. §§ 2319-2328, 2331, 2333-2337, 2344, *recodified as amended at* 30 U.S.C. §§ 22-24, 26-28, 29, 30, 33-35, 37, 39-42, 47.

placer claim.[3] *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1063 (9th Cir. 1997). If the claim is perfected by properly staking it and complying with other statutory requirements, the claimant has the exclusive right to possession and enjoyment of all the surface included within the lines of his location. *California Coastal Com'n*, 480 U.S. at 575, 107 S. Ct. at 1422; *Talbott v. King*, 6 Mont. 76, 97-99, 9 P. 434, 435-36 (1886). The area becomes the property of the locator and, thus, segregated from the public domain—i.e., the grounds within the boundaries of the location cease to be public lands when the location is made—but the United States retains title to the land. *St. Louis Mining & Milling Co. v. Montana Mining Co.*, 171 U.S. 650, 655, 19 S. Ct. 61, 63 (1898); *California Coastal Com'n*, 480 U.S. at 575, 107 S. Ct. at 1422; *Talbott*, 6 Mont. at 108, 9 P. at 442; *Silver Bow Mining & Milling Co. v. Clarke*, 5 Mont. 378, 413, 5 P. 570, 575 (1885). Possessory interest in the claim can be held indefinitely, provided that the annual assessment work is performed, all necessary filings and fee payments are made, and the valuable mineral deposit continues to exist. *Independence Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 506 (9th Cir. 1997).

¶4 The holder of a perfected mining claim may secure fee title to the land by applying to the United States Department of the Interior for a patent[4] and complying with the requirements of the General Mining Act and regulations promulgated thereunder.

---

[3] A lode claim is a mining claim "to a well-defined vein embedded in rock," whereas a placer claim is a mining claim "where the minerals are not located in veins or lodes within rock, but are usu. in softer ground near the earth's surface." *Black's Law Dictionary* 1016 (Bryan A. Garner ed., 8th ed., West 2004).

[4] A patent, in this context, is "the deed of the government, state or federal, by which it passes title to its lands." J. Grimes, *Thompson on Real Property* vol. 5B, § 2725, at 383 (1978).

*California Coastal Com'n*, 480 U.S. at 575-76, 107 S. Ct. at 1422; *Independence Mining*, 105 F.3d at 506. One such requirement is filing in the proper land office, along with the application, a survey and field notes of the claim made by or under the direction of the United States Surveyor General showing accurately the boundaries of the claim, which must be distinctly marked by monuments on the ground. *See Silver King Coalition Mines Co. v. Conkling Mining Co.*, 255 U.S. 151, 161, 41 S. Ct. 310, 311 (1921); *see also Waskey v. Hammer*, 223 U.S. 85, 92, 32 S. Ct. 187, 188 (1912). Upon issuance of the patent, legal title to the land passes to the patent holder. *California Coastal Com'n*, 480 U.S. at 576, 107 S. Ct. at 1422. Furthermore, title relates back to the date the claim was located. *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 334-35, 26 S. Ct. 282, 286 (1906); *United States v. Etcheverry*, 230 F.2d 193, 196 (10th Cir. 1956); *Talbott*, 6 Mont. at 106-07, 9 P. at 441. In other words, "the location of a mine is the inception of a title, and . . . the patent, when issued, relates back to the location, and conveys to the patentee all the interest that the government had at the time of the location." *Murray v. City of Butte*, 7 Mont. 61, 68, 14 P. 656, 657 (1887) (citing *Butte City Smoke-House Lode Cases*, 6 Mont. 397, 12 P. 858 (1887), and *Deffeback v. Hawke*, 115 U.S. 392, 6 S. Ct. 95 (1885)).

## II. The Land and Road at Issue

¶5 The Cobban Placer, the Plymouth Rock Placer, and the Plymouth Rock Extension Placer are three parcels of land situated side by side in the East Ridge area of Butte, Montana. The Cobban Placer (the westernmost parcel) was located by William F. Cobban and William H. Lewis in 1892, and the federal government issued the patent in

4

1896; the Plymouth Rock Placer (the middle parcel) was located by John T. Reese in 1889, and the patent was issued in 1900; and the Plymouth Rock Extension Placer (the easternmost parcel) was located by John T. Reese in 1890, and the patent was issued in 1898. The Cobban Placer has since been subdivided into lots now owned by a number of the Landowners. The Plymouth Rock Placer and the Plymouth Rock Extension Placer, neither of which has been subdivided, are now owned by OLR. It appears from aerial photographs taken in 2002 and included in the record that all three parcels are partially forested, that the Cobban Placer contains a number of structures (residences and outbuildings), and that the Plymouth Rock Placer and the Plymouth Rock Extension Placer are largely undeveloped.

¶6 OLR plans to construct a tram, a tramway station, a parking lot, a carousel, associated amusement park rides, and other tourism-related improvements on the Plymouth Rock Extension Placer. The tram is intended to carry visitors up to Our Lady of the Rockies, a 90-foot statue atop the Continental Divide overlooking Butte. Ridership estimates for the first year of operation vary between 14,075 and 60,285 depending on a variety of factors, including ease of accessibility (construction of an exit ramp off Interstate 15 versus use of the existing frontage road) and marketing efforts.

¶7 At issue in this case is the specific route by which OLR would like to provide public access to the proposed tramway station. It appears from the 1893 survey of the Cobban Placer (Mineral Survey No. 4200), the 1897 survey of the Plymouth Rock Placer (Mineral Survey No. 5153), and the 1897 survey of the Plymouth Rock Extension Placer (Mineral Survey No. 5154) that a road historically traversed the Cobban Placer and the

5

Plymouth Rock Placer and terminated on the Plymouth Rock Extension Placer.[5] According to the field notes corresponding with these surveys, the road varied between 6 and 12 feet wide. At present, the road is paved as it enters the western edge of the Cobban Placer. It then becomes a 12-foot-wide dirt road and remains as such until it reaches a metal gate behind the Woods' detached garage (about two-thirds of the way across the Cobban Placer). Beyond the gate (i.e., heading east across the remainder of the Cobban Placer toward the Plymouth Rock Placer), the road is an unmaintained, single-track lane with grass growing down the middle.

¶8 The following depiction of the road in relation to the parcels and lots is provided in the record (labels added):

---

[5] OLR's expert testified in the District Court concerning Survey No. 5154's field notes, which detail the courses followed and the landmarks observed by the surveyor of the Plymouth Rock Extension Placer. The expert stated that "along the east end line" the surveyor encountered a road headed in an easterly direction. We note, however, that the east-end line referred to in Survey No. 5154's field notes is "the east-end line of Sur. No. 5153," i.e., the east-end line of the Plymouth Rock Placer (the middle parcel). Thus, Survey No. 5154's field notes establish that the road crossed the east-end line of the *Plymouth Rock Placer*, which is the *west*-end line of the Plymouth Rock Extension Placer. The field notes do not mention a road crossing the northern, eastern, or southern boundaries of the Plymouth Rock Extension Placer, and the road is depicted on Survey No. 5154 as terminating on the Plymouth Rock Extension Placer.



## III. Proceedings in the District Court

¶9 OLR filed the instant action on September 3, 2003, seeking a declaratory judgment that the stretch of road traversing the Cobban Placer is not a "private access driveway," as claimed by the Landowners, but rather a "public" road 60 feet in width "available for all uses of a public road by the public." In support of this claim, OLR argued the following three theories: (1) congressional grant or dedication pursuant to § 2477 of the Revised Statutes of the United States[6] ("R.S. 2477"), (2) common-law dedication, and (3) express reservation of a public road by the federal government when it issued the Cobban Placer patent.[7] The parties filed cross-motions for summary judgment and briefed each of these

---

[6] Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, *codified at* R.S. 2477, *recodified at* 43 U.S.C. § 932, *repealed by* Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793.

[7] In addition to these three theories, OLR raised a number of other theories during the course of the proceedings in the District Court. In its amended complaint, OLR alleged prescriptive use by the public; however, OLR did not pursue this theory at the summary judgment stage. Furthermore, when OLR first articulated its reservation theory (in its brief in support of its motion for summary judgment), OLR discussed easements

three theories. In addition, the Landowners argued in the alternative that if an easement does exist for public use, the easement's scope is a 12-foot-wide dirt road, not a "60-foot, 2-lane public highway barreling through [the Landowners'] properties."

¶10 The District Court held a hearing on the parties' motions on July 23, 2004, and entered findings of fact and conclusions of law on November 24, 2004. Addressing OLR's express-reservation theory, the court stated that "[a]n express easement by reservation arises when the purchaser's deed refers to a plat where the easement is clearly depicted" (citing *Pearson v. Virginia City Ranches Ass'n*, 2000 MT 12, ¶ 21, 298 Mont. 52, ¶ 21, 993 P.2d 688, ¶ 21). The court further stated that the reference to the plat "must be sufficient to put the purchaser on 'inquiry notice' that the property is being conveyed pursuant to a particular recorded document" (citing *Halverson v. Turner*, 268 Mont. 168, 173, 885 P.2d 1285, 1288 (1994)). In this regard, the court observed that the Cobban Placer patent refers to Mineral Survey No. 4200 ("MS 4200"). This survey depicts the locations, distances, and bearings of the Cobban Placer boundaries, as well as a number of improvements and natural objects, including a ditch, a creek, a road, a ravine, a cabin, and a railroad, all of which are labeled. The survey originally was filed in the United States Surveyor General's Office in Helena, Montana, on May 20, 1893, and is presently on file at the Bureau of Land Management, Montana State Office, in Billings. Thus, the

implied from prior existing use, easements implied by necessity, and easements created by express reservation. OLR then argued that "the federal government reserved an implied easement across the Cobban Placer." In response, the Landowners asserted that "an express reservation cannot be implied." Thus, assuming that OLR was relying on the two implied-easement theories as well as an express-easement theory, the Landowners addressed all three. However, OLR subsequently clarified that it was arguing an "express easement by reservation."

court reasoned that "MS 4200 was recorded and accessible to the public, such that any person with 'inquiry notice' could access the survey to review its contents." In reaching this conclusion, the court rejected the Landowners' contention that MS 4200 was not a "recorded" document because it was not filed with the county clerk and recorder.

¶11    As for the nature of the road depicted on MS 4200, the court concluded that it is "public" for a number of reasons. First, the court reasoned that the Cobban Placer "belonged" to the United States at the time it was surveyed (in 1893) and that any road on the land, therefore, was public. Second, the court opined that at the time the Cobban Placer patent was issued (in 1896), the road was the only ingress and egress for persons seeking access to the Plymouth Rock Placer and the Plymouth Rock Extension Placer, both of which still "belonged" to the federal government. Lastly, the court observed that the road had been depicted on a number of surveys and maps over the last century, "often times being identified as a public road." It appears from this that the court attributed legal significance to the label "public" where it appeared on said surveys and maps.

¶12    The District Court held that there were no genuine issues of material fact as to OLR's express-reservation theory and that, as a matter of law, the federal government expressly reserved a public road across the Cobban Placer when it referred in the Cobban Placer patent to MS 4200. As for OLR's R.S. 2477 and common-law dedication theories, the court determined that these two theories could not be resolved on summary judgment. With respect to the former, the court held that factual questions remained as to whether the public accepted the federal government's offer under R.S. 2477 by establishing a public highway in a manner recognized under state law. With respect to the latter, the

9

court likewise ruled that factual questions remained regarding the public's acceptance of the alleged common-law dedication of the road to the public. Moreover, the court observed that the parties had "presented conflicting evidence regarding the following issues: (1) the actual commercial or public uses of the Road, if any, and the duration of such uses; (2) the nature and extent of county maintenance of the Road; and (3) the width of the Road, if it is determined to be a public road or easement." Accordingly, the court denied OLR's motion for summary judgment with respect to the R.S. 2477 and common-law dedication theories. The court also denied the Landowners' cross-motion for summary judgment.

¶13 The Landowners now appeal from the grant of summary judgment on OLR's express-reservation theory. Neither party appeals from the District Court's denial of summary judgment on OLR's R.S. 2477 and common-law dedication theories.

## STANDARD OF REVIEW

¶14 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as did the district court. *Cole v. Valley Ice Garden, L.L.C.*, 2005 MT 115, ¶ 4, 327 Mont. 99, ¶ 4, 113 P.3d 275, ¶ 4. Rule 56(c) provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences are to be drawn therefrom in favor of the party opposing summary judgment. *Redies v. Attorneys*

10

*Liability Protection Soc.*, 2007 MT 9, ¶ 26, 335 Mont. 233, ¶ 26, 150 P.3d 930, ¶ 26. The determination that the moving party is or is not entitled to judgment as a matter of law is a legal conclusion, which we review for correctness. *Hughes v. Lynch*, 2007 MT 177, ¶ 8, 338 Mont. 214, ¶ 8, 164 P.3d 913, ¶ 8; *Hi-Tech Motors v. Bombardier Motor Corp.*, 2005 MT 187, ¶ 32, 328 Mont. 66, ¶ 32, 117 P.3d 159, ¶ 32.

## DISCUSSION

### I. Preliminary Matters

¶15 Before addressing the parties' arguments, it is necessary to dispose of four preliminary matters concerning the issues before us and the law applicable to those issues.

¶16 **First.** The parties do not dispute whether OLR itself may use the roadway across the Cobban Placer for ingress to and egress from the Plymouth Rock Placer and the Plymouth Rock Extension Placer. In their opening brief, the Landowners state that they "never have denied that a primitive road passes beyond [the Woods'] parcel, over the Clark parcel, to the Plymouth Rock Placer parcels, and never have denied that the road provides private access for the owners of those parcels." The Landowners do not identify the source of this private easement; however, that point is immaterial to our analysis, since the specific dispute in this case is whether *the general public* may use the roadway to access the Plymouth Rock Placer and the Plymouth Rock Extension Placer.

¶17 **Second.** The scope of this appeal is confined to OLR's express-reservation theory, which is the only theory on which the District Court granted summary judgment and is the only theory argued by the parties on appeal. Under this theory, a public road

across the Cobban Placer was created by express reservation in the Cobban Placer documents of conveyance (the Cobban Placer patent, MS 4200, and MS 4200's field notes). Notwithstanding, the Dissent presents a lengthy argument that a public road across the Cobban Placer was created under R.S. 2477. Yet, the District Court explicitly determined with respect to OLR's R.S. 2477 theory that "questions of material fact exist and the issue cannot be resolved by summary judgment." Neither party has appealed from this ruling. Accordingly, OLR's R.S. 2477 theory is an issue to be addressed by the parties on remand, should they choose to do so; it is not an issue for this Court to decide on this appeal. Indeed, as OLR points out in its response brief on appeal, any discussion about R.S. 2477 is "irrelevant to this case."

¶18   **Third.** The only facts that are pertinent to our analysis herein are those which pertain to the creation of MS 4200 and to the issuance of the Cobban Placer patent and over which there is no genuine dispute. The Dissent, however, inserts into this appeal a number of factual matters that are irrelevant, unproven, disputed by the parties, or contradicted by the record. For instance, the Dissent advises us that we should "examine the development of the Road at issue," Dissent, ¶ 102, and the Dissent then purports to do so, opining that the road depicted on MS 4200 has been in existence and in use since 1889 when John T. Reese located the Plymouth Rock Placer, that the road constituted the sole means of access to the Plymouth Rock Placer and the Plymouth Rock Extension Placer, and that William F. Cobban and William H. Lewis were "familiar with" the road when they located the Cobban Placer in 1892, *see* Dissent, ¶¶ 106, 108, 110, 125, 130, 135, 136, 139. These factual matters, however, are not established in the record. No

12

evidence has been presented in this case as to what roads, if any, existed in 1889 and 1892 in the area which ultimately became the Cobban Placer and the Plymouth Rock Placer and what route Reese actually used when he located his claim. There also is no evidence in the record establishing when the road at issue was constructed, who actually used it, and over what period of time they did so. According to the report provided by OLR's expert in conjunction with the results of his research, his evidence established the existence of the road only since 1893, when the Cobban Placer was surveyed and MS 4200 was created.[8] But even if the road did exist as early as 1889, there is nothing in the record establishing that it was made "public" pursuant to any of the methods of creating a public road under Montana law prior to 1892, when the Cobban Placer was segregated from the public domain. *See* ¶¶ 3, 5, *supra*; *State ex rel. Dansie v. Nolan*, 58 Mont. 167, 173, 191 P. 150, 152 (1920). The District Court made no findings of fact as to any of these matters. Indeed, the court observed that the parties had presented conflicting evidence regarding "the actual commercial or public uses of the Road, if any, and the duration of such uses." Thus, the Dissent's suggestion that these matters are established in the record is false.

¶19 Moreover, the question at hand is not whether a public road was established over the Cobban Placer by necessity, public use, or acceptance of a dedication to the public.

---

[8] Included with the expert's report is a Northern Pacific Railway map, dated 1890-1914, which shows a small portion of the road. However, this map depicts the road entering the Cobban Placer from the west, whereas MS 4200 depicts the road entering from the northwest. According to the report and the expert's testimony, the shift from the northwest access point shown on MS 4200 to the west access point shown on the 1890-1914 map occurred sometime between 1893 and 1914. In other words, the map dated 1890-1914 necessarily *post*-dates MS 4200.

Rather, as explained above, the question is whether the District Court correctly determined, as a matter of law, that the federal government created a public road by express reservation in the Cobban Placer documents of conveyance. For this reason, the Dissent's dubious factual assertions, which largely relate to its R.S. 2477 argument, are not relevant to the issue on appeal.

¶20 Along these same lines, the Dissent relies on various maps and records pertaining to the subject properties. *See e.g.* Dissent, ¶¶ 111, 138. However, none of these maps and records is referred to in the Cobban Placer patent. As a matter of fact, all of these maps and records *post-date* the patent. Thus, the maps and records cited by the Dissent are entirely irrelevant for purposes of ascertaining the federal government's intent when it issued the Cobban Placer patent in 1896. Again, the only documents and facts of record that are pertinent to our analysis are those which pertain to the creation of MS 4200 and to the issuance of the Cobban Placer patent and over which there is no genuine dispute.

¶21 **Fourth.** The last preliminary matter concerns the law applicable to our interpretation of the Cobban Placer patent. Although the Cobban Placer patent contains an express reservation of "a right of way . . . for ditches or canals constructed by the authority of the United States," the patent contains no such express reservation of a "public road" across the Cobban Placer. Thus, OLR invokes a state-law doctrine, articulated by this Court during the last 22 years, under which an easement may be created by reference in an instrument of conveyance to a plat or certificate of survey which adequately describes the easement. (This doctrine is explained in detail below.) OLR contends that the federal government expressly reserved a public road across the

14

Cobban Placer by referring in the Cobban Placer patent to MS 4200, which depicts a road that is labeled "ROAD." The Dissent also presents a brief argument premised on this easement-by-reference doctrine. Dissent, ¶¶ 134-138. Yet, neither OLR nor the Dissent cites any authority that such a doctrine existed under Montana law when the Cobban Placer patent was issued or that parties to land transfers in 1896 even contemplated that easements could be created in this manner. More to the point, OLR and the Dissent cite no authority that the federal government's intent in an 1896 land patent may be construed pursuant to a doctrine that evolved under state law 100 years after the fact.

¶22 In this regard, the Landowners, citing *Ritter v. Morton*, 513 F.2d 942, 946 (9th Cir. 1975), point out that federal law governs the construction of a federal land patent and the quantum of the premises which it conveys. OLR responds that, pursuant to "well established federal common law," where lands are granted according to an official plat of the survey of such lands, the plat itself becomes a part of the grant or deed by which the lands are conveyed. However, the Landowners correctly point out that not one of the federal cases cited by OLR recognizes the creation of an easement by reference in a federal land patent to a mineral survey. Furthermore, the Landowners contend that federal law in 1896 required a reservation to be set out expressly in the patent itself, not divined from a depiction on a referenced mineral survey.[9]

¶23 Yet, at no point during this exchange does either party present a sufficiently comprehensive analysis as to which law—federal or state—governs the construction of

---

[9] The Landowners also point out that OLR's "federal common law" theory is raised for the first time on appeal. It was not argued in the District Court and, thus, was not considered by the District Court in evaluating OLR's motion for summary judgment.

15

the Cobban Placer patent, and this issue is not as straightforward as the Landowner's citation to *Ritter* suggests. In *United States v. Oregon*, 295 U.S. 1, 55 S. Ct. 610 (1935), the Supreme Court stated that "[t]he construction of grants by the United States is a federal not a state question and involves the consideration of state questions only in so far as it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction as applicable to its conveyances." *Oregon*, 295 U.S. at 28, 55 S. Ct. at 621 (citations omitted); *see also United States v. Pappas*, 814 F.2d 1342, 1345 n. 8 (9th Cir. 1987) ("Unless Congress expresses a contrary intention, federal patents will be construed according to the law of the state in which the land lies."). Thus, it appears that the threshold issue here is whether the United States adopted and assented to a state rule of construction.

¶24    If a state rule of construction does guide the interpretation of the Cobban Placer patent, the next issue is whether an easement—more specifically, a public road—could be created under Montana law in 1896 by a mere reference in an instrument of conveyance to a plat or survey depicting the easement. *See Hash v. United States*, 403 F.3d 1308, 1315 (Fed. Cir. 2005) ("[T]he property rights of these [land patentees] are governed by the law in effect at the time they acquired their land."); *United States v. Gates of the Mountains Lakeshore Homes, Inc.*, 732 F.2d 1411, 1413 (9th Cir. 1984) (considering the law as it stood at the time of the land grant, i.e., in March 1901). As noted above, OLR simply assumes that an easement could be created by this method in 1896, without citation to a single case supporting this position. For their part, the Landowners contend that the easement-by-reference doctrine relied on by OLR is "modern" and "does not

16

apply retroactively to a century-old Federal land conveyance." Yet, while this doctrine is indeed of recent vintage, the notion of an easement created by operation of law to effect the presumed intent of the grantor is longstanding. *See e.g. Herrin v. Sieben*, 46 Mont. 226, 234-35, 127 P. 323, 328 (1912); *Pioneer Mining Co. v. Bannack Gold Mining Co.*, 60 Mont. 254, 262-65, 198 P. 748, 750-51 (1921). Thus, the Landowners' observation that the easement-by-reference doctrine is "modern" does not fully answer the question whether an easement could be created under Montana law in 1896 by referring in an instrument of conveyance to a plat or survey depicting the easement.

¶25 Notwithstanding the parties' competing assumptions as to which law applies, however, we have determined that we need not decide these two choice-of-law issues because we conclude, for the reasons which follow, that neither federal law nor the state-law doctrine relied on by OLR supports OLR's express-reservation theory.

## II. Federal Law

¶26 OLR contends that MS 4200 and the corresponding field notes are part of the Cobban Placer patent. On this point, OLR is correct. In *Cragin v. Powell*, 128 U.S. 691, 9 S. Ct. 203 (1888), the Supreme Court stated:

> It is a well-settled principle that when lands are granted according to an official plat of the survey of such lands, the plat itself, with all its notes, lines, descriptions, and land-marks, becomes as much a part of the grant or deed by which they are conveyed, and controls, so far as limits are concerned, as if such descriptive features were written out upon the face of the deed or the grant itself.

*Cragin*, 128 U.S. at 696, 9 S. Ct. at 205; *see also Chapman & Dewey Lumber Co. v. St. Francis Levee Dist.*, 232 U.S. 186, 196-97, 34 S. Ct. 297, 299 (1914); *Pittsmont Copper*

17

*Co. v. Vanina*, 71 Mont. 44, 54, 227 P. 46, 48 (1924). Here, MS 4200 is an official plat of the survey of the Cobban Placer Mining Claim. Although the Cobban Placer patent does not state specifically that the land is being granted "according to" MS 4200, the Supreme Court stated in *Jefferis v. East Omaha Land Co.*, 134 U.S. 178, 10 S. Ct. 518 (1890), that "where a plat is *referred to* in a deed as containing a description of land, the courses, distances, and other particulars appearing upon the plat are to be as much regarded, in ascertaining the true description of the land and the intent of the parties, as if they had been expressly enumerated in the deed." *Jefferis*, 134 U.S. at 194-95, 10 S. Ct. at 522 (emphasis added). The Cobban Placer patent identifies the land being granted as "that certain PLACER mining claim and premises, designated by the Surveyor General as Lot No. 4200," and it describes the land pursuant to MS 4200's field notes. Accordingly, MS 4200, with all its notes, lines, descriptions, and landmarks, is a part of the Cobban Placer patent as if such descriptive features were written out upon the face of the patent itself.

¶27 So ends OLR's analysis under federal law. Yet, establishing that MS 4200 and the field notes are a part of the Cobban Placer patent is far from establishing that the federal government intended to reserve a public road across the Cobban Placer. In this regard, the Landowners cite *Leo Sheep Co. v. United States*, 440 U.S. 668, 99 S. Ct. 1403 (1979), in which the Supreme Court declined to recognize a reservation of an easement by the federal government to build a public road across land that was originally granted to the Union Pacific Railroad under the Union Pacific Act of 1862. This Act set out a few specific reservations to the grant—e.g., the grant was not to include mineral lands and

18

land to which there were homestead claims. Thus, given the existence of these explicit exceptions, the Supreme Court noted that it had in the past "refused to add to this list by divining some 'implicit' congressional intent." *See Leo Sheep*, 440 U.S. at 678-79, 99 S. Ct. at 1409 (citing *Missouri, Kansas, & Texas Ry. Co. v. Kansas Pacific Ry. Co.*, 97 U.S. 491 (1878)). Indeed, the inference prompted by the omission of any reference in the 1862 Act to the right asserted by the government (to build a public road across the granted land) was that no such right had been reserved, *see Leo Sheep*, 440 U.S. at 681, 99 S. Ct. at 1410, and the Supreme Court stated that it was "unwilling to imply rights-of-way, with the substantial impact that such implication would have on property rights granted over 100 years ago, in the absence of a stronger case for their implication than the Government makes here," *Leo Sheep*, 440 U.S. at 682, 99 S. Ct. at 1411.[10]

¶28 OLR contends that *Leo Sheep* is inapplicable to this case because OLR's theory is one of express, not implied, reservation of an easement. Yet, OLR's theory is that a public road was reserved over the Cobban Placer by virtue of the reference in the Cobban Placer patent to MS 4200, and OLR cites no authority for the proposition that a reference in a federal land patent to a mineral survey which depicts a road labeled "ROAD" qualifies as an "express" reservation under federal law. In any case, we conclude that the rules of construction articulated in *Leo Sheep* are pertinent in construing the federal government's intent when it issued the Cobban Placer patent.

---

[10] The Supreme Court also rejected the government's theory of an implied easement by necessity, noting that because the government has the power of eminent domain, the easement was not a necessity. *See Leo Sheep*, 440 U.S. at 679-80, 99 S. Ct. at 1409-10.

¶29    Turning, then, to the language of the Cobban Placer patent, we observe that this document contains a number of express reservations to the grant. In particular, "there is reserved from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States." In addition, the patent states that

> the premises hereby conveyed may be entered by the proprietor of any vein or lode of quartz or other rock in place bearing . . . valuable deposits, for the purpose of extracting and removing the ore from such vein or lode, should the same, or any part thereof, be found to penetrate, intersect, pass through or dip into the mining ground or premises hereby granted.[11]

But there is no express reservation of a road—let alone a public road—anywhere in the patent.

¶30    The inference prompted by the presence of certain express reservations in the patent and the absence of an express reservation of the particular right-of-way alleged by OLR (a public road) is that no such right-of-way was reserved. *Leo Sheep*, 440 U.S. at 681, 99 S. Ct. at 1410. Indeed, on this point, the Landowners direct our attention to *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005), where the land patents at issue reserved to the United States certain specified rights (namely, previously vested and accrued water rights, previously granted mineral rights, and rights-of-way for ditches or canals) but did not mention the right alleged by the government (a reversionary interest in land underlying discontinued railroad rights-of-way). *See Hash*, 403 F.3d at 1314. The *Hash* court refused to imply a reservation of this right in light of "the well-recognized rule that

---

[11] This provision or language similar thereto, which appeared in a number of land patents during this period, has been characterized as an "express reservation." *See Montana Mining Co. v. St. Louis Mining & Milling Co.*, 183 F. 51, 61 (9th C.C. 1910); *see also Waterloo Mining Co. v. Doe*, 82 F. 45, 50 (9th C.C. 1897); *Montana Co. v. Clark*, 42 F. 626, 628-29 (C.C.D. Mont. 1890).

property rights that are not explicitly reserved by the grantor cannot be inferred to have been retained." *Hash*, 403 F.3d at 1314. The court observed that the Supreme Court "has consistently preserved the integrity of the land grant patent" and "has required that unless a property interest was expressly reserved by the government, whether in the patent grant or by statute or regulation then in effect, the disposition of the land was in fee simple." *Hash*, 403 F.3d at 1315-16. These principles compel the same conclusion in the case at hand, namely, that the United States did not reserve a public road over the Cobban Placer.

¶31 OLR points out, however, that the reservation in the Cobban Placer patent for ditches or canals was required by 43 U.S.C. § 945 in all patents for lands taken up after August 30, 1890. But this only confirms that when the federal government wishes to include an express reservation in a patent, it is perfectly capable of doing so. OLR suggests that the United States would not have reserved an easement for public roads "in every patent." But surely, had it wished to do so, Congress could have required that an express reservation of public roads be included in all patents under particular circumstances—e.g., when a road already existed across the mining claim at the time the claim was surveyed. Again, no such express reservation appears in the Cobban Placer patent, which compels the conclusion that no public road was reserved.

¶32 Nevertheless, OLR maintains that the reference in the patent to MS 4200, the depiction on MS 4200 of a road labeled "ROAD," and the descriptions of this road (its width, location, and course) in the field notes demonstrate the federal government's "clear intent" to reserve a public road. Yet, according to the 1890 *Manual of Surveying Instructions for the Survey of the Public Lands of the United States and Private Land*

*Claims*, surveyors were required to note a wide variety of objects and data during a survey, including creeks, ponds, ravines, improvements (e.g., cabins, groves, forges), natural curiosities, and "[r]oads and trails, with their directions, whence and whither." The purpose of these notations is made clear in the Surveyor General's certification on MS 4200:

> The Original Field Notes of the Survey of the Mining Claim . . . known as the Cobban Placer from which this plat has been made under my direction have been examined and approved, and are on file in this office, and I hereby certify that they furnish such an accurate description of said Mining Claim as will, if incorporated into a patent, serve fully *to identify the premises*, and that such reference is made therein to natural objects or permanent monuments as will *perpetuate and fix the* locus *thereof.* [Emphases added.]

¶33   Given these stated purposes of MS 4200's field notes, we conclude that the intent behind describing the road therein and depicting it on MS 4200 was to aid in the identification of the Cobban Placer and to fix the locus thereof. It is inconceivable that the federal government intended to reserve for public use every creek, trail, cabin, mineshaft, ravine, railroad, and so forth depicted and labeled on a mineral survey. Indeed, OLR's argument overstates the function and authority of the Cobban Placer surveyor. *See e.g. State v. Crawford*, 441 P.2d 586 (Ariz. App. 1968). In *Crawford*, the government argued that a surveyor's notation of a public right-of-way on a survey plat referred to in the landowner's patent was tantamount to an explicit reservation or exception in the patent itself and that the landowner was bound thereby. *Crawford*, 441 P.2d at 588, 589. The court rejected this argument outright, stating that the existence of the right-of-way in question depended on the pertinent Arizona laws regarding the

22

establishment of highways. *Crawford*, 441 P.2d at 589. The court further observed that the force of the government's argument was "broken by well-settled limitations imposed on the function and authority of a surveyor. . . . While the reference to the plat of this surveyor undoubtedly has bearing upon the legal boundaries of the tract of land conveyed, this plat cannot determine the legality of the right-of-way here in dispute." *Crawford*, 441 P.2d at 589.

¶34     Furthermore, it is highly improbable that the United States would reserve a *public* road to access two mining claims—the Plymouth Rock Placer and the Plymouth Rock Extension Placer—that had already been located and, thus, segregated from the public domain. *See* ¶¶ 3, 5, *supra*. Indeed, the testimony of OLR's expert on this point is consistent with our conclusion. At the hearing, the District Court inquired whether, "if there's a map that says 'road,' does that give you an indication that the public has access to that?" In response, the expert testified: "No. In that particular case, the only access that would be a public road is if it was public lands on both sides that the road was traversing through, and at the time it was dedicated, it was accessing public lands on both sides." As just noted, the Plymouth Rock Placer and the Plymouth Rock Extension Placer had already ceased to be public lands by 1893 when the Cobban Placer was surveyed and MS 4200 was created. According to the interpretation offered by OLR's expert, therefore, the label "ROAD" on MS 4200 is *not* indicative of a public road. For these reasons, we do not agree with OLR's assertion that the Cobban Placer patent, MS 4200, and the field notes, taken together, demonstrate a "clear intent" to reserve a public road.

¶35 Finally, even if we could agree that the depiction of the road on MS 4200 constitutes an attempted reservation of a public right-of-way across the Cobban Placer, we would be forced to conclude that this reservation is void. In *Silver Bow Mining & Milling Co. v. Clarke*, 5 Mont. 378, 5 P. 570 (1885), the Court discussed an exception that the Land Department had inserted into the patent for the Pawnbroker Lode Claim. This claim was located in 1875, and the patent was issued in 1880. The exception stated as follows: "excepting and excluding from said patent all town-site property rights upon the surface, and all houses, buildings, lots, blocks, streets, alleys, or other municipal improvements on the surface of said Pawnbroker mining claim." *Silver Bow M. & M. Co.*, 5 Mont. at 407-08, 5 P. at 571. Addressing the validity of this exception, the Court first stated the settled principle that "[a] patent for a mining claim relates back to the location, and is the consummation of the purchase then made." *Silver Bow M. & M. Co.*, 5 Mont. at 422, 5 P. at 580. In other words, "the patentee obtains the same right under [the patent] that he would have obtained if the patent had issued immediately after the location and compliance with the terms of the statute," and "[n]o unauthorized act of the land-officer in issuing the patent can defeat this title." *Silver Bow M. & M. Co.*, 5 Mont. at 422-23, 5 P. at 580. Continuing its analysis, the Court observed that the Land Department "must act within the scope of its authority, and as authorized by law. If it goes beyond its jurisdiction, the patent would be so far void." *Silver Bow M. & M. Co.*, 5 Mont. at 424-25, 5 P. at 581-82. Accordingly, where the Land Department inserts into the granting part of a patent an exception or reservation that the law does not authorize, the exception or reservation is void and must be disregarded. *Silver Bow M. & M. Co.*, 5

24

Mont. at 425, 426-27, 5 P. at 582, 583; *accord Talbott v. King*, 6 Mont. 76, 98-99, 9 P. 434, 435-36 (1886). Applying these principles, the Court held as follows:

> There was no law authorizing the land department to except the surface ground from the conveyance [of the Pawnbroker mining claim], or in any other manner to abridge the title of the purchaser; and in so doing, it exceeded its authority, and its act to that extent is void and of no effect upon the property conveyed. An exception that is void, leaves the patent to stand as though it contained no such exception.

*Silver Bow M. & M. Co.*, 5 Mont. at 426, 5 P. at 582.

¶36 In the case at hand, the reservation contained in the Cobban Placer patent of "a right of way . . . for ditches or canals constructed by the authority of the United States" was statutorily authorized; indeed, it was mandated. *See* 43 U.S.C. § 945 ("In all patents for lands taken up after August 30, 1890, under any of the land laws of the United States or on entries or claims validated by this Act, west of the one hundredth meridian, it shall be expressed that there is reserved from the lands in said patent described a right of way thereon for ditches or canals constructed by the authority of the United States."). However, OLR cites no law—and we have found none—authorizing the Land Department to insert a reservation of a public road into the Cobban Placer patent. Necessarily, then, to the extent the depiction of the road on MS 4200 and the reference in the Cobban Placer patent to MS 4200 were intended together as a reservation of a public road, as OLR contends, this reservation is void and must be disregarded.

¶37 The Dissent asserts that we err by not interpreting the Cobban Placer patent pursuant to R.S. 2477. Dissent, ¶ 137. According to the Dissent, R.S. 2477 expresses an intent on the part of the United States to reserve public highways over mining claims.

Thus, in the Dissent's view, although the Cobban Placer documents of conveyance do not contain an express reservation of a public road, the federal government's intent to reserve one may be gleaned from R.S. 2477. Setting aside the facts that this theory was not argued by OLR in the District Court, was not the basis of the District Court's decision, and is not argued by OLR on appeal, the Dissent cites no authority whatsoever for the proposition that Congress intended R.S. 2477 to function as a reservation of public roads in federal land patents. Moreover, the Dissent's theory flies directly in the face of the Supreme Court's clear instruction not to imply rights-of-way based on an inferred intent, i.e., an intent not set forth expressly in the land patent or an applicable statute. *See Leo Sheep*, 440 U.S. at 678-82, 99 S. Ct. at 1409-11. In this regard, the Dissent's theory overlooks the fact that the Cobban Placer patent was issued (according to its opening language) "[i]n pursuance of the provisions of the Revised Statutes of the United States, Chapter Six, Title Thirty-two, and legislation supplemental thereto." Chapter 6, Title 32 of the Revised Statutes is comprised of Sections 2318 to 2352. Section 2477, however, is contained in Chapter 11, Title 32 of the Revised Statutes. Thus, R.S. 2477 is inapposite for interpreting a patent which was granted in pursuance of R.S. 2318 to 2352.

¶38 But even if it could be said that R.S. 2477 somehow bears on our interpretation of the Cobban Placer patent, this provision merely stated that "[t]he right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." This language was nothing more than "an *offer* of the right of way for the construction of a public highway on some particular strip of public land." *State ex rel. Dansie v. Nolan*, 58 Mont. 167, 173, 191 P. 150, 152 (1920) (emphasis added); *accord*

26

*United States v. Pruden*, 172 F.2d 503, 505 (10th Cir. 1949). The offer remained in abeyance until it was accepted by the construction of a public highway in a manner authorized by the laws of the state in which the land was situated, and it became effective as a right-of-way only when the road was thus finally constructed.[12] *See Nolan*, 58 Mont. at 173-74, 191 P. at 152; *Pruden*, 172 F.2d at 505; *Moulton v. Irish*, 67 Mont. 504, 507, 218 P. 1053, 1054 (1923). Nothing in this scheme suggests that Congress intended to create public roads indiscriminately, unilaterally, and without regard for the wishes of the affected local body of government. *See Crawford*, 441 P.2d at 590 ("[R.S. 2477] does not of itself operate to grant right-of-ways and establish highways contrary to the local laws."); *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735, 763 n. 15 (10th Cir. 2005) (observing that each state had the authority to govern its own acceptance of the R.S. 2477 offer). R.S. 2477 evinces an intent to offer the right-of-way for the construction of a public highway in a manner authorized by the laws of the state, not an intent to reserve for public use all roads depicted on mineral surveys.

¶39    Indeed, the notion of R.S. 2477 as some sort of implicit reservation was rejected long ago in *Robertson v. Smith*, 1 Mont. 410 (1871):

---

[12] Prior to July 1, 1895, a public highway could have been established by the act of the proper authorities, as provided by statute; by use by the public, for the period of the statute of limitations as to lands, of the exact route confined to the statutory width of a highway, later claimed to be a public highway; by the opening and dedication of a road by an individual owner of the land; or on a partition of real property. Effective July 1, 1895, no route of travel could become a public highway until declared so by the public authorities or made so by the owner's dedication of the land affected. *See Nolan*, 58 Mont. at 172, 173, 191 P. at 152; *Barnard Realty Co. v. City of Butte*, 48 Mont. 102, 109-10, 136 P. 1064, 1067 (1913).

> The defendants [the county commissioners of Meagher County] insist that any miner who locates a mining claim does so subject to right of the public under [R.S. 2477] to construct a highway over the same. There is no reservation of this kind in the grant to the miner. . . . The proper construction of the law upon these subjects is, I think, that miners have the right to occupy and explore unappropriated public mineral lands; that the public have a right to an easement for a highway over the unoccupied public domain, and that whichever is prior in time is prior in right. It is as inconsistent for the public to claim a right of way over an appropriated mining claim without giving the owner thereof a just compensation for his rights as it would be for a miner to claim the right to appropriate for mining purposes a portion of the public domain which had been devoted to the use of a public highway. The statute does not, by express terms, or by implication, make either of these rights superior to each other.

*Robertson*, 1 Mont. at 417-18; *accord St. Louis & San Francisco R. Co. v. Love*, 118 P. 259, 260-61 (Okla. 1911) (observing that R.S. 2477 amounted to "a standing offer," not a "reservation"); *see also Southern Utah Wilderness Alliance*, 425 F.3d at 766 n. 17 (noting that the Land Department declined to treat R.S. 2477 as an express reservation of a right-of-way in a patent for a land grant (citing *Douglas County, Washington*, 26 Pub. Lands Dec. 446 (1898))). We therefore reject the Dissent's expansive reading of R.S. 2477, under which the depiction of a road on a mineral survey constitutes a reservation of a public thoroughfare, whether or not the R.S. 2477 offer was accepted in a manner authorized by state law.

¶40    The Supreme Court "has traditionally recognized the special need for certainty and predictability where land titles are concerned," and the Court is, therefore, "unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation." *Leo Sheep*, 440 U.S. at 687-88, 99 S. Ct. at 1413-14. Given this sentiment—with which we agree—we will not divine some implicit intent

on the part of the United States to reserve a public road across the Cobban Placer based on nothing more than the notation of a 6-foot-wide road in MS 4200's field notes and the depiction of this road on MS 4200. The impact such an implication would have on those property rights in this state which derive from federal land patents granted more than a century ago is substantial and cannot be disregarded based on such an implausible inference.

¶41 The reference in the Cobban Placer patent to MS 4200 did not reserve a public road over the Cobban Placer under federal law.

**III. State Law**

¶42 As noted above, in support of its express-reservation theory, OLR invoked the state-law doctrine under which an easement may be created by reference in an instrument of conveyance to a plat or certificate of survey which adequately describes the easement. The District Court, accordingly, analyzed OLR's claim pursuant to this doctrine. OLR again relies on the doctrine on appeal, as does the Dissent.

¶43 Yet, the terms of the Cobban Placer patent are governed by the law in effect at the time the patent was issued, *Hash v. United States*, 403 F.3d 1308, 1315 (Fed. Cir. 2005); *United States v. Gates of the Mountains Lakeshore Homes, Inc.*, 732 F.2d 1411, 1413 (9th Cir. 1984), and at no point in their respective arguments does OLR or the Dissent produce any authority establishing that under Montana law in 1896, a public road could be created merely by referring in a federal land patent to a mineral survey depicting a road labeled "ROAD." Rather, OLR and the Dissent simply assume that a public road could be created in this manner—an assumption that the Landowners correctly dispute.

¶44 Nevertheless, because the easement-by-reference doctrine is the sole basis of OLR's state-law arguments, and because the doctrine correspondingly is the sole basis of the District Court's decision on OLR's express-reservation theory, we will address this issue by assuming, arguendo, that the doctrine applies retroactively to the Cobban Placer patent, and we will consider whether the doctrine provides for the creation of a public road across the Cobban Placer. We begin, however, by reviewing the doctrine and its evolution in our caselaw.

### A. Easements Created by Reference to a Plat or Certificate of Survey

¶45 In *Majers v. Shining Mountains*, 219 Mont. 366, 711 P.2d 1375 (1986), Shining Mountains acquired and subdivided a 7,000-acre ranch. In order to sell the lots, Shining Mountains prepared and recorded subdivision plats which assigned a number to each lot and designated common areas and roadways. The purchase and sale contracts prepared by Shining Mountains specifically referred to the recorded plats. *See Majers*, 219 Mont. at 367, 711 P.2d at 1376. On these facts, we held that the purchasers had acquired private easements for the designated uses. *See Majers*, 219 Mont. at 371, 711 P.2d at 1378. In so doing, we observed that selling lots with reference to a map or plat designating streets, parks, or other open areas creates an implied covenant that the streets, parks, or other open areas exist and shall be used in the manner designated. *See Majers*, 219 Mont. at 370-71, 711 P.2d at 1377-78. The rationale for this rule, we noted, is " 'the use made of the plat in inducing the purchasers.' " *Majers*, 219 Mont. at 371, 711 P.2d at 1378 (quoting *Ute Park Summer Homes Ass'n v. Maxwell Land Grant Co.*, 427 P.2d 249, 253 (N.M. 1967)). More specifically, as the *Ute Park* court explained:

> [A] grantor, who induces purchasers, by use of a plat, to believe that streets, squares, courts, parks, or other open areas shown on the plat will be kept open for their use and benefit, and the purchasers have acted upon such inducement, is required by common honesty to do that which he represented he would do.

*Ute Park*, 427 P.2d at 253.

¶46 In *Benson v. Pyfer*, 240 Mont. 175, 783 P.2d 923 (1989), we reaffirmed that selling lots with reference to a map or plat may create an easement benefiting the purchasers. We observed that under § 76-3-304, MCA, when land is sold with reference to a properly recorded plat, the plat becomes part of (i.e., is incorporated into) the document conveying the interest in land. *See Benson*, 240 Mont. at 179, 783 P.2d at 925. The effect of this statutory provision, we reasoned, is to create an easement for the purchaser's benefit with respect to improvements represented on the plat. *See Benson*, 240 Mont. at 179, 783 P.2d at 925 (citing *Majers*, 219 Mont. at 370, 711 P.2d at 1377). Likewise, in *Pearson v. Virginia City Ranches Ass'n*, 2000 MT 12, 298 Mont. 52, 993 P.2d 688, we stated that "an easement arises when a purchaser's deed refers to a plat where an easement is depicted and labeled," *Pearson*, ¶ 26, and we concluded, based on this rule, that a bridle path easement had been created for the use of all lot owners in the subdivision because the purchasers' deeds referred to a recorded plat that clearly depicted and labeled this easement, *see Pearson*, ¶¶ 1-27.

¶47 We applied these principles in favor of the sellers in *Bache v. Owens*, 267 Mont. 279, 883 P.2d 817 (1994). At issue in that case was a 33.64-acre tract of land owned by the Baches. They agreed to sell 2.42 acres (Tract 2) to Owens and to retain the remaining 31.22 acres (Tract 1). The 1988 deed described the property being conveyed by metes

and bounds and then referred to the property conveyed as "Tract 2 shown on Certificate of Survey No. 1657." Certificate of Survey No. 1657, in turn, provided legal descriptions and a scaled drawing of the boundaries of Tracts 1 and 2. In addition, the certificate of survey depicted a dotted line 30 feet east of, and parallel to, the western boundary of Tract 2. The dotted line extended from the northern boundary of Tract 2 to the southern boundary of Tract 2. The area between the dotted line and the western boundary of Tract 2 was labeled "P.R.E.," which the legend identified as "private roadway easement." *See Bache*, 267 Mont. at 281-82, 291, 883 P.2d at 819, 823.

¶48    The Baches asserted that by these transaction documents, they had reserved an easement across Tract 2 for the benefit of Tract 1. We agreed. Citing *Benson*, 240 Mont. at 179, 783 P.2d at 925, and § 76-3-304, MCA, we observed that "reference in documents of conveyance to a plat which describes an easement establishes the easement." *Bache*, 267 Mont. at 283, 883 P.2d at 820; *see also Bache*, 267 Mont. at 285, 883 P.2d at 821 ("[A] map or plat incorporated into an instrument of conveyance can establish an easement." (citing *Majers*, 219 Mont. at 371, 711 P.2d at 1378)). We further observed that Certificate of Survey No. 1657 "identifies the easement clearly and specifically" with the dotted line and the label "private roadway easement," and that it "was filed with the county clerk and recorder, as required by law." *Bache*, 267 Mont. at 286, 883 P.2d at 822. We held, therefore, that the transaction documents established an easement in favor of Tract 1 along the western edge of Tract 2, as described in the certificate of survey. *Bache*, 267 Mont. at 286, 883 P.2d at 822.

¶49    We reached the same conclusion in *Halverson v. Turner*, 268 Mont. 168, 885 P.2d 1285 (1994).  That case involved two adjoining tracts of land owned by the parties' predecessor in interest, Dahlia Halverson.  In 1987, Dahlia transferred the western tract to Shirley Turner while retaining the eastern tract.  The deed referred to a recorded certificate of survey that showed a 30-foot-wide road easement extending from the northeast corner of Turner's tract westerly for a distance of 188.52 feet.  This easement was to provide access from Dahlia's retained and otherwise-landlocked tract to a street running north from the northern boundary of Turner's tract.  *See Halverson*, 268 Mont. at 170-71, 885 P.2d at 1287.

¶50    In analyzing these transaction documents, we observed that a land description is a necessary inclusion in an instrument conveying title so that the extent of the claim to the property may be determined, and a reference to a map or plat may be included to express, confirm, or amplify the land description.  *See Halverson*, 268 Mont. at 172, 885 P.2d at 1288.  Furthermore, reference in documents of conveyance to a plat which describes an easement establishes the easement, but in determining the existence of an easement by reservation in the documents of conveyance, it is necessary that the grantee of the property being burdened by the servitude have knowledge of its use or its necessity.  *See Halverson*, 268 Mont. at 172, 173, 885 P.2d at 1288, 1289.  Applying these principles, we noted that although the description of the property being conveyed by the Dahlia-Turner deed did not contain language expressly reserving an easement to Dahlia, it did refer to the recorded certificate of survey which "clearly show[ed]" and "adequately described" the 30-foot-wide road easement.  *See Halverson*, 268 Mont. at 172, 173, 885

33

P.2d at 1288, 1289. We held that in this manner, Dahlia had reserved an easement over Turner's tract for the benefit of Dahlia's tract. *See Halverson*, 268 Mont. at 174, 885 P.2d at 1289.

¶51 By contrast, the 1968 plat at issue in *Tungsten Holdings, Inc. v. Parker*, 282 Mont. 387, 938 P.2d 641 (1997), depicted a meandering strip of land 40 feet wide and approximately 2,700 feet long, which was identified simply as "lot 34." This parcel resembled a roadway, and the district court found that there was "no other conceivable purpose a parcel of this configuration . . . could reasonably serve." Yet, nothing in the plat specifically identified lot 34 as such. *See Tungsten Holdings*, 282 Mont. at 388-89, 938 P.2d at 642. Thus, we held that the mere fact that lot 34's long and narrow configuration gave it "the appearance of a roadway" or that the developers "may have intended it as [a] roadway" was not sufficient to create a road easement. *See Tungsten Holdings*, 282 Mont. at 390, 938 P.2d at 642-43. We explained that "[e]asements by reservation must be created or reserved in writing" and "Tungsten can point to no deed or plat which contains any language dedicating or identifying lot 34 as a roadway." *Tungsten Holdings*, 282 Mont. at 390, 938 P.2d at 643.

¶52 We discussed an important limitation on the easement-by-reference doctrine in *Ruana v. Grigonis*, 275 Mont. 441, 913 P.2d 1247 (1996). The properties at issue in that case were split from single ownership in 1977 into a northern tract and a southern tract. Later, the successors in interest to the northern tract claimed that an easement existed for their benefit over the southern tract. However, the language of the 1977 deed did not create or reserve this easement, and the certificate of survey to which the 1977 deed

referred did not depict this easement either. *See Ruana*, 275 Mont. at 444-45, 448-49, 913 P.2d at 1249-50, 1252-53. Although subsequent deeds subdividing the southern tract into smaller parcels referred to certificates of survey that did clearly depict and specifically identify the claimed easement, *see Ruana*, 275 Mont. at 449, 450, 913 P.2d at 1252, 1253, we noted that under *Bache* and *Halverson*, "an easement by reservation can be established when, *in conjunction with a division of land*, the subject easement is shown on the certificate of survey and the certificate of survey is referred to and incorporated in the deed of conveyance," *Ruana*, 275 Mont. at 449, 913 P.2d at 1253 (emphasis added). Thus, we held that the 1977 transaction documents which split the northern and southern tracts from single ownership were "decisive," *Ruana*, 275 Mont. at 448, 913 P.2d at 1252; and because these documents did not describe the claimed easement, we concluded that the northern tract did not benefit from this easement over the southern tract, *see Ruana*, 275 Mont. at 450-51, 913 P.2d at 1253-54.

¶53 We addressed a related restriction on the doctrine in *Kelly v. Wallace*, 1998 MT 307, 292 Mont. 129, 972 P.2d 1117. The plaintiffs claimed that references to an easement in the deeds of conveyance between the defendants' predecessors in interest and the defendants were effective as a matter of law to reserve an easement in favor of the plaintiffs. *See Kelly*, ¶ 47. We disagreed, explaining that while "[a]n easement by reservation may be established by reference in a document of conveyance to a recorded COS which adequately describes the easement," "creation of an easement by reservation in [this] manner requires that the grantor be a party to the conveyance and that he intend to reserve his own previously-held right to use the servient estate after he sells the

divided parcel." *Kelly*, ¶ 48. We noted that we may depart from the general rule that an easement cannot be created in favor of a stranger to the deed in order to give effect to the grantor's intent to benefit a nonparty. *See Kelly*, ¶ 49 (citing *Medhus v. Dutter*, 184 Mont. 437, 444, 603 P.2d 669, 673 (1979)). However, we emphasized that such intent must be "clearly shown," *see Kelly*, ¶ 49, and we held that express depiction of an easement on a referenced plat is not sufficient to demonstrate the grantor's intent to create an easement for the benefit of a nonparty, *see Kelly*, ¶ 51. *See also Loomis v. Luraski*, 2001 MT 223, ¶¶ 27-37, 306 Mont. 478, ¶¶ 27-37, 36 P.3d 862, ¶¶ 27-37.

¶54    To summarize, our cases have recognized the creation of an easement where the deed explicitly referred to a recorded plat or certificate of survey on which the subject easement was adequately described. However, express depiction of an easement on a referenced plat or certificate of survey is not sufficient, in and of itself, to create an easement for the benefit of a stranger to the deed. In addition, an easement by reservation may be established only when the dominant and servient estates are split from single ownership.

¶55    An easement created in this manner—i.e., by reference in an instrument of conveyance to a plat or certificate of survey on which the easement is adequately described—must arise expressly, not by implication. In *Albert G. Hoyem Trust v. Galt*, 1998 MT 300, 292 Mont. 56, 968 P.2d 1135, we observed that "[a]n easement by implication is created by operation of law at the time of severance, rather than by written instrument," and that "[t]here are only two types of implied easements: (1) an intended easement based on a use that existed when the dominant and servient estates were

36

severed, and (2) an easement by necessity." *Hoyem Trust*, ¶ 17. By contrast, we stated in *Halverson* that "[a]n easement by reservation must arise from the written documents of conveyance." *Halverson*, 268 Mont. at 172, 885 P.2d at 1288; *accord Ruana*, 275 Mont. at 447, 913 P.2d at 1251; *Tungsten Holdings*, 282 Mont. at 390, 938 P.2d at 642; *Pearson*, ¶¶ 18, 20. When the deed itself contains no language reserving (or granting) an easement, our easement-by-reference doctrine contemplates that an adequately described easement depicted on a referenced plat or certificate of survey is sufficient to establish the easement.

¶56 In *Bache*, for instance, the certificate of survey depicted Tracts 1 and 2 and a 30-foot-wide strip of land along the western boundary of Tract 2. The strip of land extended from Tract 1 to a state route on the other side of Tract 2, and it was "clearly and specifically" identified with the label "P.R.E.," which the legend identified as "private roadway easement." We held that in this manner, the Baches had reserved an easement over Tract 2 in favor of Tract 1. *See Bache*, 267 Mont. at 282, 286, 291, 883 P.2d at 819, 822, 823. In *Halverson*, the certificate of survey "clearly show[ed]" and "adequately described" a 30-foot-wide road easement extending from the northeast corner of Turner's tract westerly for a distance of 188.52 feet to provide access from Dahlia's adjoining retained tract to a street running north from the northern boundary of Turner's tract. We held that in this manner, Dahlia had reserved an easement over Turner's tract for the benefit of Dahlia's tract. *See Halverson*, 268 Mont. at 170-71, 172, 173, 885 P.2d at 1287, 1288, 1289. In *Pearson*, the plat "clearly depict[ed] and label[ed]" a bridle path easement crossing the subdivision for the use of all lot owners. *See Pearson*, ¶¶ 1, 10,

17. In each of these cases, express language was used (1) to refer in the instrument of conveyance to the plat or certificate of survey and (2) to identify and describe the intended easement. By contrast, in *Tungsten Holdings*, the mere fact that lot 34's "long and narrow configuration" gave it "the appearance of a roadway" or that "the developers may have intended it as roadway" was insufficient. *Tungsten Holdings*, 282 Mont. at 390, 938 P.2d at 643.

¶57 In sum, an easement created by reference in an instrument of conveyance to a plat or certificate of survey adequately describing the easement is an express easement. The term "express" is defined as "[c]learly and unmistakably communicated; directly stated." *Black's Law Dictionary* 620 (Bryan A. Garner ed., 8th ed., West 2004); *cf.* § 28-2-103, MCA (defining an "express" contract as "one the terms of which are stated in words"). The term "expressed" is defined as "[d]eclared in direct terms; stated in words; not left to inference or implication." *Black's Law Dictionary* 620. Consistent with these definitions, the intent to create an easement must be clearly and unmistakably communicated on the referenced plat or certificate of survey using labeling or other express language. This is the minimal requirement to establish the easement. An easement may not be inferred or implied from an unlabeled or inadequately described swath of land or other such depiction appearing on a plat or certificate of survey.

### B. Application of the Doctrine to the Cobban Placer Patent

¶58 Relying on *Majers*, *Bache*, *Halverson*, *Tungsten Holdings*, *Ruana*, and *Pearson*, OLR maintains that the United States expressly reserved a public road across the Cobban Placer, for purposes of ingress to and egress from the Plymouth Rock Placer and the

Plymouth Rock Extension Placer, when it issued the Cobban Placer patent. OLR asserts that all three of these parcels were "in common ownership" when the patent was issued in 1896; that MS 4200 and the corresponding field notes were incorporated into the patent; that a road traversing the Cobban Placer is "clearly depicted" on MS 4200; and that this road is "public" because it "continued to and from public property on the east and the west of the Cobban Placer."

¶59    The Landowners respond that the 1896 grant of the Cobban Placer does not come within our easement-by-reference doctrine for a variety of reasons. First, the Landowners point out that the Cobban Placer, the Plymouth Rock Placer, and the Plymouth Rock Extension Placer were each segregated from the public domain and became the property of the respective claimholders when the mining claims were located in 1892, 1889, and 1890, respectively. Therefore, the Landowners argue, when the Cobban Placer patent was issued in 1896, the three parcels were not "in common ownership." Second, the Landowners assert that a mere reference in a federal land patent to a mineral survey that depicts a road is not evidence of an intent to reserve a public easement and that the designation "Road" on a mineral survey is, in and of itself, no more significant than the designations "Fence," "Cabin," "Creek," "Mineshaft," "Dam," etc. Third, the Landowners contend that our easement-by-reference doctrine serves to create *private*, not public, easements. Lastly, the Landowners argue that our easement-by-reference doctrine only applies to plats and certificates of survey that have been filed and recorded with the county clerk and recorder. They contend that the safe and orderly transfer of land titles depends on the ability of purchasers and title examiners to find all documents pertaining

39

to the title of the subject property at a central repository within each county and that the District Court's approach in the case at hand undermines this established system.

¶60    We agree with the Landowners that the Cobban Placer documents of conveyance do not meet the requisites of our easement-by-reference doctrine; however, we need not address all of the points raised by the Landowners because the following two considerations are sufficient to resolve this issue.

¶61    First, we have only recognized the creation of *privately*-held easements under our easement-by-reference cases.  We have never applied the doctrine to create a public road, and we decline to do so under the circumstances presented here.  As the Landowners point out, the creation of public roads in 1896 was governed by specific provisions of law which generally required an official action on the part of the public authority.  *See Barnard Realty Co. v. City of Butte*, 48 Mont. 102, 109-10, 136 P. 1064, 1067 (1913); *State ex rel. Dansie v. Nolan*, 58 Mont. 167, 172-73, 191 P. 150, 152 (1920).  OLR and the Dissent would have this Court hold that a public road could be established by a method not contemplated by any provision of law in 1896—namely, by referring in a federal land patent to a mineral survey which depicts a road labeled "ROAD."  However, it would be inappropriate for this Court, by judicial fiat 112 years after the fact, to adopt this as a method of creating public roads in 1896—particularly since such a "public-road-by-reference" doctrine would enable a grantor to circumvent the procedures and formalities that existed in 1896 and unilaterally create a public road, thereby saddling the public authority with responsibility for the new public road without any acceptance whatsoever by the public authority.

¶62 Second, as explained above, the intent to create the subject easement must be clearly and unmistakably communicated on the referenced plat or certificate of survey using express language. Here, however, there is no label or other express language on MS 4200 communicating an intent to reserve the depicted road as a "public" road. Nor is there any evidence in the field notes or in the Cobban Placer patent itself of an intent on the part of the federal government to reserve a public road across the Cobban Placer. The label "ROAD" on MS 4200 is not sufficient under any of our cases to create an easement in favor of the public. Moreover, the evidence in the record before us reflects that creating a public road was *not* the federal government's intent. The Cobban Placer, the Plymouth Rock Placer, and the Plymouth Rock Extension Placer were segregated from the public domain in 1892, 1889, and 1890, respectively. At that point, each mining claimholder had the exclusive right to possession and enjoyment of all the surface included within the lines of his respective parcel. *See* ¶ 3, *supra*. It is highly improbable that the United States, when it issued the Cobban Placer patent in 1896, would reserve a public road across the Cobban Placer to access two parcels which had left the public domain six years (the Plymouth Rock Extension Placer) and seven years (the Plymouth Rock Placer) earlier and which were, in 1896, in the exclusive possession of the claimholder (John T. Reese). Indeed, OLR's expert opined that the label "road" on a plat or survey is not indicative of a *public* road unless the road is providing access to and from public lands on both sides of the property at issue. *See* ¶ 34, *supra*. We therefore do not agree with OLR's contention that the mere depiction of a road labeled "ROAD" on MS 4200 clearly and unmistakably communicates an intent to reserve a "public" road.

¶63 The Dissent argues that the federal government's intent to reserve a public road across the Cobban Placer is clear in light of R.S. 2477. Dissent, ¶ 137. However, the fact that the Dissent is resorting to R.S. 2477 in order to ascertain the meaning of the label "ROAD" on MS 4200 only confirms that the federal government's supposed intent to reserve a public road is not clearly and unmistakably communicated on MS 4200 using appropriate labeling or other express language.

¶64 For the foregoing reasons, we hold that the reference in the Cobban Placer patent to MS 4200 did not reserve a public road across the Cobban Placer under our easement-by-reference doctrine.

¶65 Before concluding, it is necessary to address the Dissent's assertion that this Opinion somehow "reaches a result at odds with the practical realities of the history of property ownership in Montana, particularly with respect to the location and patenting of mining claims in and around Butte." Dissent, ¶ 101. This diaphanous remark is based entirely on the Dissent's own theory of this case—not on the theory actually argued by the parties—and on factual assumptions that are not supported by the record before us. Moreover, the Dissent's assertion is disconnected from any property law applicable to the Cobban Placer patent. The Dissent fails to cite a single statute in effect in 1896 supporting a result contrary to the holdings reached herein. The Dissent likewise fails to cite any caselaw in effect in 1896 supporting a result contrary to the holdings reached herein.

¶66 It appears that the Dissent would graft R.S. 2477 onto this Court's easement-by-reference doctrine and then apply this new public-road doctrine retroactively, and

42

indiscriminately, to countless land transfers across the span of more than 100 years, resulting in the creation of untold numbers of unforeseen—and unintended—public servitudes across countless parcels of land in this state. The Dissent would do so without regard for "the special need for certainty and predictability where land titles are concerned," *Leo Sheep*, 440 U.S. at 687, 99 S. Ct. at 1413, and without regard for "the substantial impact" that implying rights-of-way would have on property rights granted over 100 years ago, *Leo Sheep*, 440 U.S. at 682, 99 S. Ct. at 1411.

¶67 As a matter of construing the federal government's intent in issuing the Cobban Placer patent, we may not upset long-settled expectations to accommodate a vague and unsubstantiated right to construct a 60-foot-wide public highway without compensation to the servient Landowners. *Leo Sheep*, 440 U.S. at 681-82, 687-88, 99 S. Ct. at 1410-11, 1413-14. Quite to the contrary, past, present, and future generations of Montana landowners have the right to be secure in the knowledge that they will not wake up one morning to find that a community or organization has decided to build a 60-foot-wide public highway through their back yards based on nothing more than a surveyor's notation of a 6-foot-wide dirt road on a 115-year-old mineral survey and a healthy dose of sophistical prestidigitation.

**CONCLUSION**

¶68 The federal government did not reserve a public road across the Cobban Placer by virtue of the reference in the Cobban Placer patent to MS 4200. Accordingly, we hold that the District Court erred in its determination that the road traversing the Cobban

43

Placer is a public road pursuant to an express easement by reservation created in MS 4200 and referred to in the conveying documents of the Cobban Placer.

¶69    Reversed.

/S/ JAMES C. NELSON

We concur:

/S/ BLAIR JONES
District Court Judge Blair Jones
sitting for Chief Justice Karla M. Gray

/S/ PATRICIA COTTER

/S/ JIM RICE

Justice James C. Nelson, specially concurring.

¶70    The specific issue presented on this appeal is whether the District Court erred in its determination that, as a matter of law, the federal government created a public road by express reservation in the Cobban Placer documents of conveyance.  I believe the Court's Opinion correctly and fully resolves this issue.

¶71    As for OLR's R.S. 2477 theory, the District Court considered this theory and determined that "questions of material fact exist and the issue cannot be resolved by summary judgment."  The Dissent states that the District Court erred in this respect.

44

Dissent, ¶ 107.  This remark, however, is gratuitous at best, given that neither party has appealed from the court's ruling.  Indeed, neither party raises OLR's R.S. 2477 theory on appeal.  The Dissent acknowledges this point.  Dissent, ¶ 107.  Nevertheless, the Dissent offers a lengthy argument that a public road across the Cobban Placer was created under R.S. 2477 as a matter of law.  Dissent, ¶¶ 102-130.  A review of the record reveals that the Dissent's argument builds on and further develops the arguments articulated by OLR in its Response in Opposition to Defendants' Motion for Summary Judgment.

¶72    In addition, the Dissent addresses the matter of termination.  Dissent, ¶¶ 131-132.  The Landowners argued this issue in their motion for summary judgment, claiming that any public road that may have existed across the Cobban Placer was extinguished by reverse prescription.  The District Court ruled that the parties had "presented conflicting evidence to this Court regarding these questions of material fact [related to prescriptive use]" and, accordingly, denied summary judgment on this issue.  The Landowners have not appealed from this ruling.

¶73    The propriety of the Dissent's approach in light of the procedural posture of this case is self-evident and requires no further comment.  That said, to the extent the Dissent's various articulations of the law related to R.S. 2477 could be viewed as a guidebook for subsequent proceedings in the District Court on remand, I believe it is necessary and appropriate to explain why the Dissent's R.S. 2477 analysis founders in several respects.

¶74    The Dissent stresses the principle that a mining claimant took title to his claim subject to any valid easements against the United States existing at the time the claim was

45

located.  Dissent, ¶¶ 105, 119, 122, 124.  No one disputes this point.  Indeed, "a grant by the United States conveys all the interest that the United States has at the time of the grant, and no greater interest. . . .  [T]he United States cannot, by patent, convey to any grantee a greater right than it has at the time of such grant." *Murray v. City of Butte*, 7 Mont. 61, 68, 14 P. 656, 657 (1887) (citing *Butte City Smoke-House Lode Cases*, 6 Mont. 397, 12 P. 858 (1887), and *Deffeback v. Hawke*, 115 U.S. 392, 6 S. Ct. 95 (1885)).  Thus, a valid acceptance of the R.S. 2477 offer prior to the date of the location upon which a patent was based was "valid against the government, and therefore valid against the subsequent grantees of the government, who must take the land in question, subject to any easement which was valid against the government at the time of the location." *Murray*, 7 Mont. at 68-69, 14 P. at 657; *accord City of Butte v. Mikosowitz*, 39 Mont. 350, 355, 102 P. 593, 595 (1909).  Conversely, "where one acquires from the United States legal or equitable title *prior to* an effective acceptance of the [R.S. 2477] grant or dedication, he and his successors in interest do not hold subject to an easement for the subsequent establishment of a highway." *United States v. Pruden*, 172 F.2d 503, 505 (10th Cir. 1949) (emphasis added).

¶75     Of course, these relatively unremarkable propositions assume the very matter to be decided under OLR's R.S. 2477 theory—namely, whether there was a valid acceptance of the R.S. 2477 offer prior to February 20, 1892, when the Cobban Placer was located.  The Dissent asserts that John T. Reese accepted the offer.  Dissent, ¶¶ 119, 139.  Yet, the Dissent offers no basis whatsoever for this assertion other than the fact that Reese located the Plymouth Rock Placer in 1889 and the Plymouth Rock Extension Placer in 1890.  The

legal question of whether the R.S. 2477 offer was validly accepted cannot be answered based on nothing more than a document stating that someone located a mining claim at a particular place and time. Rather, the answer to this question depends on the legal rules governing the creation of public highways and on actual evidence—not mere conjecture—that these rules were satisfied. *Standage Ventures, Inc. v. Arizona*, 499 F.2d 248, 250 (9th Cir. 1974).

¶76    R.S. 2477 states, in its entirety, as follows: "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." It is well-settled that R.S. 2477 is "an offer of the right of way for the construction of a public highway on some particular strip of public land." *State ex rel. Dansie v. Nolan*, 58 Mont. 167, 173, 191 P. 150, 152 (1920). It is also well-settled that this offer can only be accepted by the "construction" of a public highway in a manner authorized by the laws of the state in which the land is situated. *Nolan*, 58 Mont. at 173, 191 P. at 152. The cases standing for these points are legion. *See Pruden*, 172 F.2d at 505 (citing cases); *Moulton v. Irish*, 67 Mont. 504, 507, 218 P. 1053, 1054 (1923) (and cases cited therein); *but see Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735, 768 (10th Cir. 2005) (concluding "that federal law governs the interpretation of R.S. 2477, but that in determining what is required for acceptance of a right of way under the statute, federal law 'borrows' from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent").

¶77 Here, the Cobban Placer left the public domain on February 20, 1892, when William F. Cobban and William H. Lewis located this mining claim. *See* Opinion, ¶¶ 3, 5. Therefore, in order to determine whether there was a valid acceptance of the R.S. 2477 offer as applied to the Cobban Placer, it is necessary first to identify the methods for establishing a public highway under Montana law in the years prior to 1892. *See Richter v. Rose*, 1998 MT 165, ¶ 27, 289 Mont. 379, ¶ 27, 962 P.2d 583, ¶ 27; *Southern Utah Wilderness Alliance*, 425 F.3d at 771. We identified those methods in *Nolan*:

> Prior to July 1, 1895, a public highway could have been established either by the act of the proper authorities, as provided by the statute, or by use by the public, for the period of the statute of limitations as to lands, of the exact route confined to the statutory width of a highway, later claimed to be a public highway, or by the opening and dedication of a road by an individual owner of the land, or on a partition of real property.

*Nolan*, 58 Mont. at 173, 191 P. at 152; *accord Richter*, ¶ 28.

¶78 It has not been argued in this case that a public road was established across the Cobban Placer prior to 1892 "by the act of the proper authorities" or "on a partition of real property." Indeed, the District Court observed that OLR had not raised either of these two theories. As for "opening and dedication" by an individual landowner, this Court has previously held that R.S. 2477 does not come within the meaning of "dedication by the owner of the land" as contemplated by Montana highway laws. *See Nolan*, 58 Mont. at 172-73, 191 P. at 152. That leaves only "use by the public, for the period of the statute of limitations as to lands, of the exact route confined to the statutory width of a highway, later claimed to be a public highway." Prior to July 1, 1895, that

48

period was five years.[1]  *See Nolan*, 58 Mont. at 175, 191 P. at 153; *Montana Ore-Purchasing Co. v. Butte & Boston Consol. Min. Co.*, 25 Mont. 427, 430, 65 P. 420, 421 (1901).  Accordingly, OLR was required to demonstrate, by clear and convincing evidence (*see Watson v. Dundas*, 2006 MT 104, ¶ 41, 332 Mont. 164, ¶ 41, 136 P.3d 973, ¶ 41), that the alleged public road across the Cobban Placer existed since at least February 20, 1887, and that the public used this road in the requisite manner for a five-year period.  *See Nolan*, 58 Mont. at 174, 191 P. at 152-53 ("If, therefore, the offer is accepted by user under the laws of this state, that user must be shown to have continued over the exact route claimed, for the statutory period prior to July 1, 1895."); *see also City of Butte v. Mikosowitz*, 39 Mont. 350, 355, 102 P. 593, 595 (1909) (concluding that use by the public generally as a roadway for five years or more prior to July 1, 1895, was sufficient to accept the R.S. 2477 offer).

¶79    With respect to the character and extent of the use, it must be shown that the road was "known and used as a highway common to all the people."  *State v. Auchard*, 22 Mont. 14, 16, 55 P. 361, 362 (1898) (per curiam) (citation and internal quotation marks omitted).  Furthermore, OLR's evidence must be " 'convincing' " that the public pursued " 'a definite, fixed course, continuously and uninterruptedly,' " for the statutory period of five years.  *Moulton*, 67 Mont. at 508, 218 P. at 1055 (quoting *Violet v. Martin*, 62 Mont.

---

[1] In its discussion of OLR's R.S. 2477 theory, the District Court stated that "there has been no argument the Road was obtained by action of authorities, prescription, or partition of real property."  However, in its response in opposition to the Landowners' motion for summary judgment, OLR did assert that "the grant of the [road across the Cobban Placer] by the federal government was accepted by public use of the road for at least five years before July 1, 1895."

335, 342, 205 P. 221, 223 (1922)).  A "definite, fixed course" is "a course with clear and precise limits and of a permanent character."  *Violet*, 62 Mont. at 342, 205 P. at 223.  "[T]he mere casual journeying over what might thereafter become the right of way for a public road could not constitute the trail, thereby made, a public highway."  *Nolan*, 58 Mont. at 173, 191 P. at 152; *see also Montana Ore-Purchasing*, 25 Mont. at 431, 65 P. at 421 ("[W]here the claim is founded upon use only, without color of title, it must appear that the use has been confined to the particular way for the full time of the prescribed limitation.  Travel by the public generally over uninclosed land, but not confined to any particular way, will not inaugurate such an adverse claim as will presently ripen into a right which may be asserted against the owner." (citation omitted)).  As we stated in *Nolan*, "[i]t is inconceivable that it was the intention of Congress and of the Legislature to say that two or more persons crossing at random on each of a dozen trails across an open quarter section of land could constitute an acceptance of the government grant as to each of such trails, and the entire quarter section thus become but a series of irregular and divergent rights of way."  *Nolan*, 58 Mont. at 173, 191 P. at 152.

¶80    The Wisconsin Supreme Court reached a similar conclusion with respect to acceptance of the R.S. 2477 offer:

> As said in [*Streeter v. Stallnaker*, 85 N.W. 47, 48 (Neb. 1901)]:  "The statute was a standing offer of a free right of way over the public domain, and, as soon as it was accepted in an appropriate manner by the agents of the public or the public itself, a highway was established."  This seems to us a very fair and reasonable construction of the law.  Mere fugitive trespasses by private persons over public lands, even though continued for a considerable time, do not meet the requirement.  It has been held that it may be accepted by the state by passage of a general law [*Wells v. Pennington County*, 48 N.W. 305 (S.D. 1891)]; also by county authorities by surveying,

50

platting, and marking out a road, though such acts were insufficient to constitute a laying out of a road under the general road law [*Streeter*, *supra*]; also by more than 20 years' adverse use by the public generally [*McRose v. Bottyer*, 22 P. 393 (Cal. 1889)]. It has never been held, however, that a few months' desultory use by a few persons of a logging road or trail through the woods, with no acts by the public authorities of any kind, would constitute an acceptance of the offer made by the government.

*Town of Rolling v. Emrich*, 99 N.W. 464, 465 (Wis. 1904).

¶81 In the case at hand, it goes without saying that, thus far, there has been no evidence presented to establish by clear and convincing proof—or any other standard, for that matter (*see* Dissent, ¶ 130)—that the public pursued a definite and fixed course of a permanent character over the Cobban Placer, continuously and uninterruptedly, for five years prior to February 20, 1892, and that the road was known and used as a highway common to all the people. Not even the Dissent argues that such evidence exists in the record before us. For this reason, and notwithstanding the Dissent's contrary assertion in ¶ 107, the District Court did not err in denying summary judgment on OLR's R.S. 2477 claim.

¶82 The Dissent, however, attempts to circumvent this conclusion by offering a fifth method, not identified in *Nolan* or any other precedent, for establishing a public highway under Montana law prior to 1892—namely, use of public land by an individual for no particular amount of time. This novel theory, entirely of the Dissent's own making, is not supported by any legal authority whatsoever. Nor is it established factually in the record now before us.

¶83    The Dissent's theory proceeds as follows.  The R.S. 2477 offer was open-ended and self-executing.  Dissent, ¶¶ 104, 105, 115, 121.  Reese accepted the offer when he located the Plymouth Rock Placer in 1889 and the Plymouth Rock Extension Placer in 1890.  Dissent, ¶¶ 119, 135, 139.  (The Dissent does not actually state that locating the Plymouth Rock Placer and the Plymouth Rock Extension Placer required the construction of a public highway across the Cobban Placer, but this appears to be the Dissent's premise.)  Reese used the road that is at issue in this case.  Dissent, ¶¶ 110, 135.  It was not necessary for Reese to use the road for any particular amount of time in order to accept the R.S. 2477 offer, since acceptance does not require any particular duration of use.  Dissent, ¶¶ 115-124.  It also was not necessary for anyone but Reese to use the road, since acceptance does not require use by more than one individual.  Dissent, ¶¶ 119, 129, 139.  Therefore, a public highway across the Cobban Placer arose by operation of law and existed by 1892 when Cobban and Lewis located the Cobban Placer.  Dissent, ¶¶ 106, 122, 135.  Cobban and Lewis took title subject to this public highway.  Dissent, ¶¶ 119, 122, 124, 131.

¶84    The most obvious flaw in the Dissent's approach is its implausibility.  If the R.S. 2477 offer could be accepted merely by an individual's journeying across unenclosed public lands, then the entire countryside would consist of public highways.  As noted above, this notion was rejected long ago, *Nolan*, 58 Mont. at 173, 191 P. at 152; *Town of Rolling*, 99 N.W. at 465, and the Dissent's attempt to resurrect it is entirely unpersuasive.

¶85   That aside, the Dissent's syllogism is legally unsustainable.  It is certainly true that Congress did not specify a particular method or procedure for accepting the R.S. 2477 offer.  Nor did Congress require that the offer be accepted by application to, or approval by, the federal government.  *See San Juan County, Utah v. United States*, 503 F.3d 1163, 1168 (10th Cir. 2007); *Sierra Club v. Hodel*, 848 F.2d 1068, 1084 (10th Cir. 1988), *overruled in part on other grounds*, *Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992) (en banc).  Indeed, "the establishment of R.S. 2477 rights of way required no administrative formalities:  no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested."  *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735, 741 (10th Cir. 2005).  However, these facts do not support the Dissent's thesis that an individual could unilaterally establish a public highway without regard for the laws of the particular state in which the land was situated.  To the contrary, courts uniformly held that acceptance of the R.S. 2477 offer required implementation of an *authorized* method for establishing a public highway under the laws of the state.  *See United States v. Pruden*, 172 F.2d 503, 505 (10th Cir. 1949); *Moulton v. Irish*, 67 Mont. 504, 507, 218 P. 1053, 1054 (1923).  In other words, "the grant referred to in R.S. 2477 became effective upon the construction or establishing of highways, *in accordance with the state laws*."  *San Juan County*, 503 F.3d at 1168 (emphasis added).  The Dissent may choose to manufacture additional methods of creating public highways under Montana law in 1892 to suit its R.S. 2477 theory, but

53

this approach cannot be sustained on the ground that the R.S. 2477 offer was "open-ended and self-executing" (*see* Dissent, ¶ 104).

¶86 The same applies to the Dissent's attempt to omit any requirement of public use for the statutorily-specified period of time. Dissent, ¶¶ 115-124. The Dissent cites numerous cases from other jurisdictions for the proposition that there is no specific period of use applicable to R.S. 2477. Dissent, ¶ 118.[2] Of course, the question of whether the R.S. 2477 offer was accepted depends on the laws of Montana governing the creation of public highways prior to 1892. Consequently, cases which articulate the highway laws of Kansas, Colorado, Nebraska, California, South Dakota, Oregon, New Mexico, and Washington, are not on point for purposes of determining whether the offer was accepted in relation to the Cobban Placer. The Dissent also relies on our statement in *Moulton*, 67 Mont. at 510, 218 P. at 1055, that "[w]e do not wish to be understood as holding that the continuous use of a road by the public for five years prior to July 1, 1895, was necessary to establish a public highway over unappropriated public lands in order to meet the requirements of the statute." *See* Dissent, ¶ 117. This statement, however, must be understood in context. The proponents of the public highway in *Moulton* had "conceded . . . that, if the road in question ever became a public highway, it was created

---

[2] In particular, the Dissent cites *Hughes v. Veal*, 114 P. 1081 (Kan. 1911), *Leach v. Manhart*, 77 P.2d 652 (Colo. 1938), *Nicolas v. Grassle*, 267 P. 196 (Colo. 1928), *Streeter v. Stalnaker*, 85 N.W. 47 (Neb. 1901), *McRose v. Bottyer*, 22 P. 393 (Cal. 1889), *Wells v. Pennington County*, 48 N.W. 305 (S.D. 1891), *Wallowa County v. Wade*, 72 P. 793 (Or. 1903), *Lovelace v. Hightower*, 168 P.2d 864 (N.M. 1946), and *Smith v. Mitchell*, 58 P. 667 (Wash. 1899). These cases contrast with the approach in Arizona, which did not recognize acceptance by mere public use. *See Tucson Consol. Copper Co. v. Reese*, 100 P. 777 (Ariz. 1909).

by use or prescription only." *Moulton*, 67 Mont. at 507, 218 P. at 1054. Prior to July 1, 1895, the period for acquiring title by prescription was five years; thus, the case was tried on the theory that the use of the road at issue had to date back to July 1, 1890. *Moulton*, 67 Mont. at 508, 218 P. at 1054. Our statement, therefore, appears simply to be an acknowledgement that there were other methods of establishing public highways in Montana prior to 1895. *See Nolan*, 58 Mont. at 173, 191 P. at 152. The dictum does not stand for the proposition that public highways could be created by individual use for any random period of time.

¶87    I do agree with the Dissent's suggestion that "prescription" is an inapt term for referring to the second method identified in *Nolan* of establishing a public highway—namely, "use by the public, for the period of the statute of limitations as to lands, of the exact route confined to the statutory width of a highway, later claimed to be a public highway," *Nolan*, 58 Mont. at 173, 191 P. at 152. In *Richter v. Rose*, 1998 MT 165, 289 Mont. 379, 962 P.2d 583, we restated this quoted language from *Nolan* as "prescriptive use for the period of time required by statute," *Richter*, ¶ 28, and we have repeated this terminology in a number of subsequent cases, *see McCauley v. Thompson-Nistler*, 2000 MT 215, ¶ 21, 301 Mont. 81, ¶ 21, 10 P.3d 794, ¶ 21; *Powell County v. 5 Rockin' MS Angus Ranch*, 2004 MT 337, ¶ 17, 324 Mont. 204, ¶ 17, 102 P.3d 1210, ¶ 17. Yet, while I conclude that "prescriptive" use is inapplicable to R.S. 2477, I do not agree with the Dissent that requiring public use for the statutory time period is "counter-intuitive" as applied to R.S. 2477.

¶88    Prior to July 1, 1895, a highway could be established by prescription. *State v. Auchard*, 22 Mont. 14, 15-16, 55 P. 361, 362 (1898) (per curiam). The proponent had to present convincing evidence that the public pursued a definite and fixed course (i.e., a course with clear and precise limits and of a permanent character) over the way claimed, continuously for the time period set by law (five years). *Auchard*, 22 Mont. at 16, 55 P. at 362; *Violet v. Martin*, 62 Mont. 335, 342, 205 P. 221, 223 (1922). Moreover, the proponent had to demonstrate that the public use was with an assumption of control and right of use adverse to the landowner (i.e., without the owner's permission). *Violet*, 62 Mont. at 342, 205 P. at 223. As the Dissent points out, public acceptance of the R.S. 2477 offer cannot be "adverse" to the United States. Dissent, ¶ 119. After all, R.S. 2477 was an offer; and use under R.S. 2477, therefore, was with the federal government's permission. Thus, it is incorrect to suggest that acceptance of the offer by public use is a "prescriptive" use.

¶89    That said, the Dissent reasons that because the use is not adverse, it would be "counter-intuitive" to require the use to occur for any particular amount of time. Dissent, ¶ 119. On this point, I could not disagree more with the Dissent. For one thing, the Dissent offers no alternative objective basis for determining whether the character and extent of public use were sufficient to constitute an acceptance of the R.S. 2477 offer. The Dissent simply asserts that the location of a mining claim constitutes an acceptance of a right-of-way over adjoining public land. Notably, the Dissent provides no guidance or insight as to what specific aspects of locating a mining claim—here, the Plymouth

56

Rock Placer and the Plymouth Rock Extension Placer—involve use by the public, sufficient in character and extent, to constitute an acceptance of the R.S. 2477 offer.

¶90   More importantly, the Dissent's proposed new theory of acceptance flies in the face of 137 years of Montana precedent, without any rationale for changing course at this late date.  Five years after R.S. 2477 was enacted, the Court in *Robertson v. Smith*, 1 Mont. 410 (1871), interpreted the provision as follows:

> [R.S. 2477] does not devote any particular portion of the public domain to a highway.  It gives a general right to the public of a right of way for that purpose over public lands, and should be construed only to offer to devote to that use any lands belonging to the general government, not reserved for public uses, that the public might, *through its proper officers*, select.  Until the public then accepts the offer made, and seeks to devote some particular portion of the public domain for a highway, no rights accrue to the public over such lands.  See *The City and County of San Francisco* v. *David Calderwood et al.*, 31 Cal. 585 [1867].  No rights could have accrued to the public in the land, upon any portion of Cement gulch, *until either the legislature declared the tollroad up the same a highway, or until the said county commissioners sought to locate one there.*

*Robertson*, 1 Mont. at 417 (emphases added).  Thus, as interpreted by the Court in 1871, acceptance in Montana of the R.S. 2477 offer required action by the proper authorities.

¶91   Sixteen years later, the Court in *Murray v. City of Butte*, 7 Mont. 61, 14 P. 656 (1887), suggested that proof of "actual user and occupation" by the public could be sufficient to prove acceptance of the R.S. 2477 offer.  *See Murray*, 7 Mont. at 67, 14 P. at 657.  In so doing, the Court borrowed from the doctrine of dedication of land for public use, observing as follows:  " 'There is no particular form or ceremony necessary in the dedication of land to public use.  All that is required is the assent of the owner of the land, *and the fact of its being used for the public purposes intended by the*

*appropriation.*' " *Murray*, 7 Mont. at 67, 14 P. at 656-57 (emphasis in *Murray*) (quoting *City of Cincinnati v. White's Lessee*, 31 U.S. 431, 6 Pet. 431 (1832)). The Court did not indicate what character and extent of public use was required; however, that question was arguably immaterial given that the particular proof offered by the City (and refused by the trial court) was testimony by one of the original locators of the mining claim to the effect that when he located the claim, there were "public" streets and highways (the ones at issue) already in existence. *See Murray*, 7 Mont. at 66, 14 P. at 656.

¶92    Next, in *City of Butte v. Mikosowitz*, 39 Mont. 350, 102 P. 593 (1909), we clarified the means of accepting the R.S. 2477 offer as follows:

> The purpose of the congressional grant or dedication is to enable the public to acquire a roadway over public lands. The method by which the roadway is to be established is not specified; and it must be held, therefore, that the Congress intended that any acts by which the public might acquire a public roadway over private property, other than by purchase, would be sufficient to constitute an acceptance of this grant or dedication.

*Mikosowitz*, 39 Mont. at 355, 102 P. at 595. With respect to the strip of land at issue, we concluded that the City's evidence—which touched the character and extent of the use made of the disputed ground—supported the jury's finding "that the strip had been used by the public generally as a roadway for five years or more, prior to July 1, 1895"; the evidence, thus, "was sufficient to establish a road by prescription, if the land over which it passed had been the subject of private ownership." *Mikosowitz*, 39 Mont. at 354-55, 102 P. at 595. Hence, we effectively tethered acceptance of the R.S. 2477 offer to the methods of acquiring a public roadway over private property; and with respect to the particular factual circumstances of the case, we concluded that use of the disputed ground

in the manner and to the extent necessary to establish a public road over private property by prescription was sufficient to accept the R.S. 2477 offer over public land.

¶93 The rule that acceptance of the R.S. 2477 offer by mere public use requires use for the statutorily-prescribed period has been repeated in numerous cases since *Mikosowitz*. *See Nolan*, 58 Mont. at 173-74, 191 P. at 152-53; *Moulton*, 67 Mont. at 507-08, 218 P. at 1054, 1055; *Parker v. Elder*, 233 Mont. 75, 77-78, 758 P.2d 292, 293 (1988); *Richter v. Rose*, 1998 MT 165, ¶ 28, 289 Mont. 379, ¶ 28, 962 P.2d 583, ¶ 28. In *Nolan*, we quoted approvingly the following language from *Vogler v. Anderson*, 89 P. 551 (Wash. 1907):

> "The trial court based its judgment on the theory that the act of Congress granting a right of way for the construction of public highways over public lands not reserved for public use was a grant in praesenti, and became effective the moment the public began using the way as a public highway, and that it is not necessary that a way should be used for any specific time in order to constitute an acceptance of it as a grant under this statute. * * * But it was not said, or intended to be said, that a user for any lesser period than seven years would be sufficient for that purpose. On the contrary, to hold that a lesser period would suffice in this state would violate the terms of the grant made by Congress. The grant is for a right of way to establish a public highway, and a public highway must be established in some of the ways provided by statute before the grant takes effect. * * * The shortest period allowed by statute to establish a highway by user in this state is seven years, * * * and no user short of this period can therefore be held to be an acceptance of the grant contained in the act of Congress cited."

*Nolan*, 58 Mont. at 174-75, 191 P. at 153 (asterisks in original) (quoting *Vogler*, 89 P. at 552).

¶94 As for the character and extent of the use, as explained above, our cases have consistently required the proponent to prove that the use was, in fact, "public" and over a definite and fixed course. *See e.g. Auchard*, 22 Mont. at 16, 55 P. at 362 ("The road must

59

be known and used as a highway common to all the people." (citation and internal quotation marks omitted)); *Montana Ore-Purchasing*, 25 Mont. at 430-31, 65 P. at 421 ("[I]t must appear that the use has been confined to the particular way"; evidence that people "generally traveled" over open and unenclosed land "in any direction they chose" supports a conclusion that a public highway was *not* established.); *Violet*, 62 Mont. at 342-43, 205 P. at 223 (The alleged public road "must be so situated and so conditioned as to be available to the public, and the user—the travel—must be by the public generally, and it must be a way common to all."); *Moulton*, 67 Mont. at 509, 218 P. at 1055 (observing that the proponents' evidence failed "to establish the construction of a road or its continuous use by the public over a definite and fixed course"; the road at issue "was used by a few persons for hauling timber from the mountains where it ended," it "did not lead to any town, settlement, post office or home," and there was no evidence that the county had kept the road in repair or expended any money upon it); *Parker*, 233 Mont. at 76-77, 78, 758 P.2d at 292-93, 294 (use of the road across Elder's property by Parker and her predecessors to access a homestead and ranch buildings was not "public" use); *see also Barnard Realty Co. v. City of Butte*, 48 Mont. 102, 107-08, 136 P. 1064, 1066 (1913); *Warren v. Chouteau County*, 82 Mont. 115, 119, 122-23, 265 P. 676, 678, 679 (1928); *Maynard v. Bara*, 96 Mont. 302, 307, 30 P.2d 93, 95 (1934); *cf. Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735, 765 (10th Cir. 2005) (noting that for R.S. 2477 purposes, the Department of the Interior defined "highway" as follows: "A highway is a road over which the public at large have a right of passage and includes every thoroughfare which is used by the public, and is, in the language of the

English books, 'common to all the King's subjects.' " (citations and some internal quotation marks omitted)).

¶95    In the face of this long line of precedent requiring convincing evidence that the alleged highway was used for the statutorily-prescribed period of time and that the character and extent of the use was "common to all the people," the Dissent now argues that we should abandon our established, predictable approach in favor of a wholly arbitrary scheme under which use for no particular amount of time and by no particular number of persons is sufficient to accept the R.S. 2477 offer. As noted, the Dissent offers no guidelines other than its conclusory assertion that whatever Reese did in the course of locating the Plymouth Rock Placer and the Plymouth Rock Extension Placer, it constituted an acceptance.

¶96    This approach was not contemplated by any of our cases during the time period in which R.S. 2477 was in effect (1866-1976), and I strongly disagree with injecting such ambiguity and subjectivity into this area of law—not only because of the uncertainty it would engender with respect to land titles in this state, but also because the Dissent's approach lacks any persuasive justification. As the Tenth Circuit aptly observed in *Southern Utah Wilderness Alliance*:

> Both right-of-way holders and public and private landowners faced with potential R.S. 2477 claims have an interest in preservation of the status quo ante. That is best accomplished by not changing legal standards. In [*Sierra Club v. Hodel*, 848 F.2d 1068 (10th Cir. 1988)], this Court observed that "R.S. 2477 rightholders, on the one hand, and private landowners and [the Bureau of Land Management] as custodian of the public lands, on the other, have developed property relationships around each particular state's definition of the scope of an R.S. 2477 road." 848 F.2d at 1082-83. The same can be said of the *existence* of an R.S. 2477 road.

*Southern Utah Wilderness Alliance*, 425 F.3d at 768; *see also Southern Utah Wilderness Alliance*, 425 F.3d at 765 ("This unanimity of interpretation over a great many years is entitled to weight."). But even if we were to sever duration of use under R.S. 2477 from duration of use under the statutory period applicable to prescription, I could not subscribe to the complete and utter abandonment of any time period or clear guidelines for showing sufficient public use. None of the authorities cited by the Dissent (*see* ¶ 86 n. 2, *supra*) support such an approach.

¶97    Lastly, aside from the Dissent's legally unsound position, the Dissent's entire argument rests on factual assertions that are not established in the record before us. Indeed, it could fairly be said that the Dissent engages in wild speculation as to events and activities that may have taken place during the late 1880s and early 1890s in the area which ultimately became the Cobban Placer, the Plymouth Rock Placer, and the Plymouth Rock Extension Placer. Most notable among those, the Dissent asserts repeatedly that the road depicted on MS 4200 was constructed no later than, and has been in use since, 1889 when Reese located the Plymouth Rock Placer. The Dissent also surmises that this was not simply the only road *indicated* on the maps and surveys in the record before us, as the District Court found, but was actually the "sole" means of access to the Plymouth Rock Placer and the Plymouth Rock Extension Placer.

¶98    There is no factual basis in the record for either of these assertions. No survey or map in the record shows the road prior to 1893; no records indicate who built the road and when; and there is no evidence establishing what route(s) Reese used to access the

Plymouth Rock Placer. All we know at this point is that the road was in existence by 1893, when it was described in MS 4200's field notes as a 6-foot-wide dirt road traversing the Cobban Placer. Nevertheless, the Dissent opines that the process of locating the Plymouth Rock Placer required the construction of a public highway. Assuming this to be true, however, we do not know whether Reese constructed the particular 6-foot-wide dirt road at issue; indeed, we do not know whether he continuously used "a definite, fixed course" over the Cobban Placer or instead accessed the Plymouth Rock Placer from different points of entry, including the public land that lay to the north.[3]

¶99 As for whether the road over the Cobban Placer was used by the public, Mineral Survey No. 5154 (dated September 1897) depicts the road terminating on the Plymouth Rock Extension Placer. In other words, the road was a dead end. Moreover, as the Landowners pointed out in their reply brief in support of their motion for summary judgment, there is no evidence in the record of a substantial mining operation on either the Plymouth Rock Placer or the Plymouth Rock Extension Placer. Thus, even assuming the road existed as of 1889 when Reese located the Plymouth Rock Placer, the evidence presented by OLR thus far does not establish that that the road was "a way common to

---

[3] In this regard, I recognize that we may draw inferences from the record for purposes of evaluating OLR's motion for summary judgment. However, as the Dissent is well aware, all reasonable inferences that might be drawn from the offered evidence are to be drawn *in favor of the party opposing summary judgment. Farmers Co-op. Ass'n v. Amsden, LLC*, 2007 MT 286, ¶ 24, 339 Mont. 445, ¶ 24, 171 P.3d 690, ¶ 24; *Larsen v. Western States Ins. Agency, Inc.*, 2007 MT 270, ¶ 11, 339 Mont. 407, ¶ 11, 170 P.3d 956, ¶ 11; *Stokes v. State ex rel. Montana Dept. of Transp.*, 2007 MT 169, ¶ 7, 338 Mont. 165, ¶ 7, 162 P.3d 865, ¶ 7; *Shelton v. State Farm Mut. Auto. Ins. Co.*, 2007 MT 132, ¶ 13, 337 Mont. 378, ¶ 13, 160 P.3d 531, ¶ 13. Here, the party opposing summary judgment on OLR's R.S. 2477 theory is the Landowners; thus, all reasonable inferences that might be drawn from the offered evidence are to be drawn in the Landowners' favor.

all" and that its use was "by the public generally."[4] *Violet*, 62 Mont. at 342-43, 205 P. at 223; *cf. Brimstone Min., Inc. v. Glaus*, 2003 MT 236, ¶ 28, 317 Mont. 236, ¶ 28, 77 P.3d 175, ¶ 28 (holding that use of the road at issue by agents of the mining company for exploratory purposes and during relatively short periods of time in the summer months did not constitute continuous use by the public).

¶100 In concluding that a public highway exists, as a matter of law, over the Landowners' properties pursuant to R.S. 2477, the Dissent has misstated both the law and the record. The question of whether the road across the Cobban Placer is a public highway is an issue properly addressed following the development of a complete factual record in the District Court and a correct application of the laws governing the creation of public highways in Montana prior to 1892.

/S/ JAMES C. NELSON

---

[4] In this regard, OLR's proposal is not merely to provide public access to the Plymouth Rock Extension Placer. It is to provide public access to the Our Lady of the Rockies statue as well. In other words, OLR proposes essentially to extend the alleged public right-of-way, by way of a tram, to the top of the Continental Divide. Whether this use is within the scope of any R.S. 2477 highway that may exist over the Landowners' properties is questionable. *See Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735, 746 (10th Cir. 2005) ("[T]he scope of an R.S. 2477 right of way is limited by the established usage of the route as of the date of repeal of the statute," i.e., as of October 21, 1976.).

Justice Brian Morris dissents.

¶101 The Court's decision reaches a result at odds with the practical realities of the history of property ownership in Montana, particularly with respect to the location and patenting of mining claims in and around Butte. I dissent.

¶102 Courts in construing a statute "may with propriety recur to the history of the times when it was passed . . ." in order to ascertain the reason for a particular provision. *Leo Sheep Co. v. United States*, 440 U.S. 668, 669, 99 S. Ct. 1403, 1405 (1979). The Court would be well advised to examine the development of the Road at issue in light of the history surrounding the development of the American West and the public domain. Like much of Montana history, cases from Butte dominated the early decisions of this Court. For example, the Court in *Talbott v. King*, 6 Mont. 76, 9 P. 434 (1886), reconciled the competing claims to land in the Summit Valley mining district in Silver Bow County. The Court reconciled competing claims arising from the Lode Mining Act of 1866 and the General Mining Act of 1872, with claims arising from a patent for the "Butte" town site issued on September 26, 1877. *Talbott*, 6 Mont. at 77-78, 9 P. at 435-36.

¶103 *Talbott* highlights the fact that Montana, like every other western state, is a public domain state. 25 Stat. 676 (1889). Montana's lands passed from the public domain to private and State ownership by Act of Congress. The United States granted Montana specific tracts for schools and other public purposes in the 1889 Enabling Act. 25 Stat 676. Settlers acquired public lands under the Homestead Act of 1862, 12 Stat. 392, the Stock-Raising Homestead Act of 1916, 39 Stat. 862, and the Desert Lands Act of 1877, 19 Stat. 377. Miners, like the people who patented the Cobban Placer, acquired public

lands under the Lode Mining Act of 1866, 14 Stat. 251, and the General Mining Act of 1872, 17 Stat. 91. The United States used disposal of the public domain alternatively to civilize the wild frontier, to stimulate the American economy, and to provide structure for national transportation and distribution of American goods. Robert Tudor Hill, *The Public Domain and Democracy: A Study of Social, Economic and Political Problems in the United States in Relation to Western Development* 48 (AMS Press 1968). These goals and policies brought thousands of Americans to Montana during the late 19th century and early 20th century. *See* Hill, *The Public Doman and Democracy* at 16.

¶104 One step to promote the goal of developing mineral deposits involved the United States granting rights-of-way across the public domain for the construction of public highways through a provision of the 1866 Lode Mining Act, now commonly known as R.S. 2477. Act of July 26, 1866, ch. 262, § 1, 14 Stat. 251. Section 8 of the Act recognized and preserved rights-of-way already in existence on the public domain notwithstanding the issuance of future patents. R.S. 2477; *Murray v. City of Butte*, 7 Mont. 61, 14 P. 656, 657 (1887). The grant was "open-ended and self-executing." *Sierra Club v. Hodel*, 848 F.2d 1068, 1083 (10th Cir. 1988) overruled on other grounds by *Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992).

¶105 Every acre of Montana land originated in the public domain. 25 Stat. 676 (1889). Every Montana landowner succeeded the original sovereign landowner. Many of these landowners took title to the portions of the public domain subject to existing easements granted pursuant to R.S. 2477. *Murray*, 7 Mont. at 68-69, 14 P. at 657. Not surprisingly, the question of whether rights-of-way were in fact created on public land has generated

much litigation in light of the fact that "such a right-of-way could have come into existence without any judicial or other governmental declaration. . . ." *San Juan County v. U.S.*, 503 F.3d 1163, 1168 (10th Cir. 2007).

¶106   Both the District Court and the Court recognized that the patent issued for the Cobban Placer incorporates the 1893 survey plat and field notes of survey for MS 4200. ¶ 26; *Jefferis v. East Omaha Land Co.*, 134 U.S. 178, 194-95, 10 S. Ct. 518, 522 (1890). MS 4200 and the accompanying field notes certainly put any future purchasers on inquiry notice of the existence of a public easement across the Cobban Placer.  More importantly, the Road existed across the public domain when William F. Cobban and William H. Lewis located the Cobban Placer in 1892.  This fact creates a public road by operation of law pursuant to R.S. 2477.  *Moulton v. Irish*, 67 Mont. 504, 510, 218 P. 1053, 1055 (1923); *Murray*, 7 Mont. at 67, 14 P. at 657.

¶107   The District Court erred as a matter of law when it denied summary judgment to OLR on its R.S. 2477 claim.  I address this issue even though neither party raised it on appeal in light of the fact that the Court undertakes a review of the entire record in determining the existence of a public road.  *Reid v. Park County*, 192 Mont. 231, 236, 627 P.2d 1210, 1213 (1981).  This standard applies to situations, such as the one here, where concern exists over the ability to rely on the completeness of the record because the record is extremely old.  *Garrison v. Lincoln County*, 2003 MT 227, ¶ 16, 317 Mont. 190, ¶ 16, 77 P.3d 163, ¶ 16.  A review of the entire record reveals that this error of law, rather than any genuine issues of material fact, prevented the District Court from granting

summary judgment to OLR on its claim that the Road was a public road pursuant to R.S. 2477.

¶108 William F. Cobban and William H. Lewis located the Cobban Placer in 1892. This location of the Cobban Placer in 1892 effectively removed it from the public domain. *California Coastal Com'n v. Granite Rock Co.*, 480 U.S. 572, 575, 107 S. Ct. 1419, 1422 (1987). The Road initiated on public land to the west and south of the Cobban Placer and extended through the Cobban Placer to access the Plymouth Rock and Plymouth Rock Extension Placer at the time that Cobban and Lewis located the Cobban Placer.

¶109 Pursuant to the General Mining Law of 1872, Cobban and Lewis had the Cobban Placer surveyed in 1893. They filed the survey, MS 4200, with the U.S. Surveyor General's Office on May 20, 1893. Cobban and Lewis perfected title and received their patent for the Cobban Placer in 1896. Title passed to them from the U.S. Government. The deed transferring title from the U.S. Government to Cobban Placer referred to MS 4200 and the accompanying field notes.

¶110 MS 4200 depicts the easement crossing the claim and labels it as "ROAD." Surveyors mapped the neighboring Plymouth Rock Claims and Plymouth Rock Extension Placer Mining Claim in 1897. Both surveys depict the Road. Both surveys depict the "ROAD" as the only road to provide access. The Road has been in existence, however, at least since 1889 and 1890 when John T. Reese (Reese) located the Plymouth Rock and Plymouth Rock Extension placer claims. The Road constituted the sole means of access to the Plymouth Rock and Plymouth Rock Extension claims.

¶111 The Road does not constitute some amorphous sheep trail winding hither and yon across open country as did the one described in *State v. Nolan*, 58 Mont. 167, 172-73, 191 P. 150, 151-52 (1920). In fact, the Road has appeared without interruption and in the same location on the following maps and aerial photographs since 1893:

- A Northern Pacific Railway Map dated 1890-1913;
- A GLO map dated 1913;
- The Anaconda Company's "Hycon" base map dated 1952;
- The U.S. Geological Survey aerial photograph dated 1952;
- The U.S. Geological Survey "Homestake Quad" Map dated 1963-1978;
- A General Highway Map – Silver Bow County, indicating the road inventory for gas tax apportionment, dated 1948-1989;
- A Federal Aid, Local & City Road System, dated 1977-1986;
- A "Map of Butte & Vicinity" prepared by J. Miller of the Butte-Silver Bow/State of Montana Land Appraisal Office dated May 1986; and
- A "Cadastral Plat," Montana Department of Revenue—Property Assessment Division Butte-Silver Bow Appraisal, indicating the "ROAD" as a county road dated January 1999.

¶112 The United States, through R.S. 2477, made an express offer in 1866 to dedicate unappropriated lands for highways. *Lovelace v. Hightower*, 168 P.2d 864, 866 (N.M. 1946); *Smith v. Mitchell*, 58 P. 667, 668 (Wash. 1899). R.S. 2477 expressly provides: "[t]he right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." "No question of *implied dedication* is involved." *Lovelace*, 168 P.2d at 866 (emphasis in original). The Cobban Placer left the public domain in 1892, well after the United States's express dedication of easements in 1866 across the public domain through R.S. 2477.

¶113 The Court asserts that R.S. 2477 cannot demonstrate federal intent to create an easement in light of *Leo Sheep*, 440 U.S. 668, 99 S. Ct. 1403. ¶ 36. *Leo Sheep* concerned the proposed creation of a public roadway easement by necessity across land granted by the United States to the Union Pacific Railroad pursuant to the Union Pacific Act of 1862 and its unique checkerboard land grant. *Leo Sheep*, 440 U.S. 680-81, 99 S. Ct. 1410. The U.S. Supreme Court determined that the Act specifically listed reservations to the grant to Union Pacific. As a result, the Court refused to add to the list of expressly reserved lands contained in the Act "by divining some 'implicit' congressional intent." *Leo Sheep*, 440 U.S. at 679, 99 S. Ct. at 1409.

¶114 Congress failed to include express easements in the Union Pacific Act of 1862 due to difficulty in enticing investors into the project of developing a transcontinental railroad. Congress originally included all of the odd-numbered lots within 10 miles on either side of the track for the railroad. Congress later upped the ante to 20 miles on either side of the track when the Union Pacific's original subscription drive for private investment proved a failure. *Leo Sheep*, 440 U.S. at 676-77, 99 S. Ct. at 1408. It is not surprising in light of these difficulties, therefore, that Congress elected not to encumber the land granted to the Union Pacific with any reserved easements. The Court refused to recognize implied easements not enumerated in the Act under these circumstances. *Leo Sheep*, 440 U.S. at 679, 99 S. Ct. at 1409; *cf. Herrin v. Sieben*, 46 Mont. 226, 235, 127 P. 323, 328 (1912) (noting that the United States must have reserved an implied easement over land granted to the Northern Pacific Railway Company) overruled on other grounds by *Simonson v. McDonald*, 131 Mont. 494, 501, 311 P.2d 982, 986 (1957). *Leo Sheep's*

restriction on recognizing implied easements in the Union Pacific Act of 1862 does not apply, however, to the Cobban Placer's public easement that arises from the United States's express dedication of easements in 1866 in R.S. 2477.

¶115   The Court in *City of Butte v. Mikosowitz*, 39 Mont. 350, 102 P. 593 (1909), noted that R.S. 2477 sought "to enable the public to acquire a roadway over public lands." *Mikosowitz*, 39 Mont. at 355, 102 P. at 595.  The Court rejected the notion that R.S. 2477 dictated a particular form of establishing such a road.  *Mikosowitz*, 39 Mont. at 358, 102 P. at 595.  The Washington supreme court agreed that state and local officials need not have any role in accepting this offer of dedication made by the United States: "An offer of dedication, to bind the dedicator, need not be accepted by the city or county, or other public authorities, but may be accepted by the general public."  *Okanogan County v. Cheetham*, 80 P. 262, 264 (Wash. 1905) overruled on other grounds by *McAllister v. Okanogan County*, 100 P. 146, 147-48 (1909).  To deny the fact that local authorities need not take any action to accept the dedication "would be to deny the whole doctrine of dedication."  *Cheetham*, 80 P. at 264.  The public accepts the United States's dedication pursuant to R.S. 2477 "by entering upon the land and enjoying the privileges offered; or, briefly, by user."  *Cheetham*, 80 P. at 264.  R.S. 2477 constitutes an express dedication of easements across the public domain.  *Lovelace*, 168 P.2d at 866.

¶116   Admittedly the Court in *Nolan* rejected as insufficient testimony that a sheep trail that had been used "since the early 90's" constituted construction of a road for purposes of R.S. 2477.  *Nolan*, 58 Mont. at 170, 191 P. at 154.  The *Nolan* Court incorrectly stated that no public road could be established pursuant to R.S. 2477 without establishing public

use for the requisite five-year statutory period before Section 2600 of the Political Code took effect on July 1, 1895. *Nolan*, 58 Mont. at 173-74, 191 P. at 154. I must confess my own recent complicity in perpetrating this erroneous interpretation of R.S. 2477. *See Watson v. Dundas*, 2006 MT 104, ¶ 42, 332 Mont. 164, ¶ 42, 136 P.3d 973, ¶ 42. We noted in *Watson* that Watson had failed to cite any authority to indicate that the five-year statutory requirement before July 1, 1895, to establish a public right-of-way by prescription did not apply. *Watson*, ¶ 42. Such contrary authority surely existed, however, as evidenced by the clear statement announced by the Court in *Moulton*.

¶117 The Court in *Moulton* rejected a claim of a public road leading to some forest lands in Fergus County because the proponents had failed to demonstrate public use for the requisite five-year period before July 1, 1895. *Moulton*, 67 Mont. at 508-09, 218 P. at 1054-55. In reaching this conclusion, however, the Court cautioned that "[w]e do not wish to be understood as holding that the continuous use of a road by the public for five years prior to July 1, 1895, was necessary to establish a public highway over unappropriated public lands in order to meet the requirements of [R.S. 2477]." *Moulton*, 67 Mont. at 510, 218 P. at 1055 (citing *Murray*, 7 Mont. 61, 14 P. 656; and *Hughes v. Veal*, 114 P. 1081 (Kan. 1911)).

¶118 The Court's statement in *Moulton* rejecting public use for any statutory period comports with the majority position. *E.g., Lovelace*, 168 P.2d 864; *Leach v. Manhart,* 77 P.2d 652, 653 (Colo. 1938); *Nicolas v. Grassle*, 267 P. 196, 197 (Colo. 1928); *Hughes,* 114 P. at 1083; *Wallowa County v. Wade*, 72 P. 793, 794 (Ore. 1903); *Streeter v. Stalnaker*, 85 N.W. 47, 48 (Neb. 1901); *Wells v. Pennington County*, 48 N.W. 305, 306

(S.D. 1891); *McRose v. Bottyer*, 22 P. 393, 394-95 (Cal. 1889); *Smith*, 58 P. at 668. For example, the court in *Hughes* agreed that "[a] long user [sic] by the public is not necessary to an effectual acceptance of a dedication where the owner (the United States in this instance) has given consent, and is holding out a standing offer to dedicate land for a highway." *Hughes*, 114 P. at 1083.

¶119   It would be counter-intuitive to impose some sort of statutory period relevant to a prescriptive easement in connection with R.S. 2477.   The United States expressly dedicated an offer of an easement.  *Lovelace*, 168 P.2d at 866; *Smith*, 58 P. at 668; *Martino v. Board of County Com'rs of County of Pueblo*, 360 P.2d 804, 806-07 (Colo. 1961).  The public's acceptance of that express offer could not be adverse to the United States.  The public's acceptance of the United States's express offer of dedication also cannot be considered prescriptive.  Reese accepted this express offer of dedication when he located the Plymouth Rock in 1889 and the Plymouth Rock Extension Placer in 1890, and used the Road across the public domain to access them.  Reese's acceptance of the United States's express offer of dedication subjected any future claims on the public domain crossed by the Road to this public easement.  *Nicolas,* 267 P. at 197 ("The entrymen took title subject, of course, to the right of way.").

¶120   For example, in *Murray* the plaintiff brought an action of ejectment against the City of Butte to recover possession of certain real property situated in Butte.   The plaintiff relied upon a mineral patent that he had received from the United States.  The City of Butte defended by offering to prove that various streets and roads existed at the time of plaintiff's location of the mining claim in question.  *Murray*, 7 Mont. at 66, 14 P.

at 656. The trial court refused to allow the City of Butte to introduce the proof and this Court reversed. *Murray*, 7 Mont. at 66-67, 14 P. at 657.

¶121 The Court, relying on R.S. 2477, determined that the City of Butte should have been allowed to prove that it had accepted the grant offered by R.S. 2477. *Murray*, 7 Mont. at 67, 14 P. at 656. The Court noted that "'[t]here is no particular form of ceremony necessary in the dedication of land to public use. All that is required is the assent of the owner of the land, and the fact of its being used for the public purposes intended by the appropriation.'" *Murray*, 7 Mont. at 67, 14 P. at 656-57 (quoting *City of Cincinnati v. White's Lessee*, 31 U.S. 179, 186 (1832) (internal emphasis omitted).

¶122 The Court rejected the plaintiff's argument that the City of Butte had failed to object to his patent application or claim an easement at that time. The Court recognized that "the United States cannot, by patent, convey to any grantee a greater right than it has at the time of grant." *Murray*, 7 Mont. at 68, 14 P. at 657. The Court concluded that an easement valid against the United States would be valid against the plaintiff. The City of Butte should have been allowed to prove that the roads in question existed before the plaintiff had located his property. *Murray*, 7 Mont. at 69, 14 P. at 657. The logic of *Murray* dictates that the existence of the Road across the Cobban Placer at the time of its location in 1892 demonstrates the acceptance of the public right-of-way authorized by R.S. 2477. Cobban and Lewis took title to their mining claim subject to the Road. *Murray*, 7 Mont. at 69, 14 P. at 657.

¶123 The Court and the Landowners concede that the Road constitutes a private easement across the Cobban Placer. ¶ 16. The Court fails to explain, however, how such

74

a private easement came to exist.  It dismisses as "immaterial" the matter of the private easement.  ¶ 16.  The Court concludes that the Cobban Placer patent's omission of any expressed reserved easement for a public road defeats the notion of a public road.  ¶ 34. The same patent makes no mention of any private easement either, yet the Court and the Landowners concede that the Road existed at the time that Cobban and Lewis located the Cobban Placer in 1892.  This "immaterial" concession seems dispositive.  *Murray*, 7 Mont. at 69, 14 P. at 657.

¶124   The Court in *Murray* confirmed that a claimant took title to a mining claim subject to any easements valid against the United States when the land comprised the public domain.  *Murray*, 7 Mont. at 68, 14 P. at 657.  Similarly, the court in *Hughes* recognized that where the United States, as the owner of the public domain, consents to the easement "the length of time of the public use is not important, for upon acceptance by use the rights of the public to an easement immediately passed and vested."  *Hughes*, 114 P. at 1083.  The court in *Streeter*, likewise interpreted R.S. 2477 as a standing offer for a free right-of-way over the public domain "and as soon as it was accepted in an appropriate manner by the agents of the public, *or the public itself*, a highway was established." *Streeter*, 85 N.W. at 48 (emphasis added) (citing *McRose*, 22 P. 393).

¶125   The Court curiously relies on *Robertson v. Smith*, 1 Mont. 410, 417 (Mont. Terr. 1871), for the proposition that R.S. 2477 constituted some sort of implicit reservation. ¶ 39.  There Meagher County sought to lay out a public road pursuant to R.S. 2477 across a mining claim that already had been located and removed from the public domain. *Robertson*, 1 Mont. at 413.  The Court correctly rejected the public road based upon the

notion that "whichever is prior in time is prior in right." *Robertson*, 1 Mont. at 418. Here the Road was "prior in time" as it existed across the public domain at the time that Cobban and Lewis located the Cobban Placer in 1892. They took title to the Cobban Placer subject to the existing road. *Murray*, 7 Mont. at 68, 14 P. at 657.

¶126 The South Dakota supreme court understood Congress's intent in enacting R.S. 2477 as follows:

> [T]o enable the citizens and residents of the states and territories where public lands belonging to the United States were situated to build and construct such highways across the public domain as the exigencies of their localities might require, without making themselves liable as trespassers. And when the location of the highway and roads was made by competent authority *or by public use*, the dedication took effect by relation as of the date of the act; the act having the same operation upon the lines of the road as if specifically described in it.

*Wells*, 48 N.W. at 306 (emphasis added); *see also Wade*, 72 P. at 794.

¶127 The language of Section 2600 of the Political Code comports with this understanding. The statute provided in pertinent part that "[a]ll highways, roads, streets, alleys, courts, places and bridges laid out or erected by the public or *now traveled or used by the public* . . . are public highways." Section 2600 (emphasis added). Montana adopted the language of Section 2600 from the California code that had contained a similar provision since 1883. *Bolinger v. City of Bozeman*, 158 Mont. 507, 511, 493 P.2d 1062, 1064 (1972); *see also McRose*, 22 P. at 394.

¶128 The term "now," as used in Section 2600, "clearly indicates the intention to leave intact such rights as the public had already acquired. . . ." *Barnard Realty Co. v. City of Butte*, 48 Mont. 102, 110, 136 P. 1064, 1067 (1913). By contrast, the Legislature

expressed its intent that after July 1, 1895, a highway could not be established by use unless accompanied by some action on the part of the public authorities. *Barnard Realty Co.*, 48 Mont. at 110, 136 P. at 1067. The Court in *Barnard Realty Co.* recognized the distinction between the creation of public highways before 1895, and the creation of public highways after Section 2600 went into effect on July 1, 1895.

¶129   Reese surely could not have obtained a private easement across the public domain when he located the Plymouth Rock in 1889 and accessed it by the Road. *E.g.*, *United States v. California*, 332 U.S. 19, 40, 67 S. Ct. 1658, 1669 (1947) (stating the general rule that a party cannot obtain a prescriptive easement against the United States). The Court deems it "highly improbable that the United States would reserve a *public* road to access two mining claims . . ." that had been segregated from the public domain. ¶ 34 (emphasis in original). Others disagree. A road may be a public highway even though it reaches but one property owner. *Leach*, 77 P.2d at 653; *Nicolas*, 267 P. at 197 (citing 29 C.J. 367). The property owner has the right to use the highway to reach his property and the public has a corresponding right of access along the highway to the private property. *Leach*, 77 P.2d at 653; *Nicolas*, 267 P. at 197. Thus, Reese had the right to use the Road to reach the Plymouth Rock when he located it in 1889. *King v. Brown*, 284 P.2d 214, 215-16 (N.M. 1955) (citing *Murray*, 7 Mont. 61, 14 P. 656). The public had a corresponding right to use the Road to the point that it reached the Plymouth Rock. *Leach*, 77 P.2d at 653; *Nicolas*, 267 P. at 197; *Pagels v. Oaks*, 19 N.W. 905, 907 (Iowa 1884).

¶130 The standard for determining the existence of a public road is whether the record, taken as a whole, shows that a public road was created. *Lee v. Musselshell County*, 2004 MT 64, ¶ 14, 320 Mont. 294, ¶ 14, 87 P.3d 423, ¶ 14; *Reid*, 192 Mont. at 236, 627 P.2d at 1213. We do not require strict proof that the circumstances satisfy the statutory standards in cases where the documentation is very old in light of the fact that it is more difficult to rely on the completeness of the record. *Lee*, ¶¶ 14, 17. We do know, however, that the Road has been used and in existence since 1889 when Reese located the Plymouth Rock Placer claim.

¶131 The District Court found that the Road, as depicted on MS 4200 in 1893, constituted the sole means of access to the Plymouth Rock and Plymouth Rock Extension claims. Cobban's and Lewis's segregation of the Cobban Placer from the public domain in 1892 had no effect on the public easement, unless his occupation of the claim could have the effect of extinguishing an existing easement. Easements terminate only by some method recognized by law. Gerald Korngold et al., *Private Land Use Arrangements: Easements, Real Covenants, and Equitable Servitudes*, § 6.01 (2d ed. Juris Publg. 2004). The common law recognizes numerous legal methods to terminate an easement including by terms of an agreement, completion of the purpose of the easement, adverse possession, overuse, alternation of dominant estate, abandonment, estoppel, merger, destruction of servient estate, and by tax deed, among others. Korngold, *Private Land Use Arrangements: Easements, Real Covenants, and Equitable Servitudes*, §§ 6.02-6.16.

¶132 The Legislature has recognized merger, destruction of the servient estate, acting in a way inconsistent with the easement, and abandonment of a prescriptive easement for

the statutory period as methods to terminate an easement. Section 70-17-111(1)(a)-(d), MCA. Montana courts also recognize clear and unambiguous easement language, *See Mularoni v. Bing*, 2001 MT 215, ¶ 32, 306 Mont. 405, ¶ 32, 34 P.3d 497, ¶ 32, easement by prescription, *Leisz v. Avista Corp.*, 2007 MT 347, ¶ 16, 340 Mont. 294, ¶ 16, 174 P.3d 481, ¶ 16, and abandonment pursuant to statute, *Park County Rod & Gun Club v. Department of Hwys.*, 163 Mont. 372, 376-77, 517 P.2d 352, 355 (1973); Section 7-14-2615, MCA, as methods to extinguish an easement. The intent to abandon, however, must be clear and unambiguous. *Smith v. Russell*, 2003 MT 326, ¶¶ 19-20, 318 Mont. 336, ¶¶ 19-20, 80 P.3d 431, ¶¶ 19-20. Cobban's and Lewis's location and occupation upon the Cobban Placer claim does not fall within the ambit of any of the recognized methods to terminate an easement in Montana.

¶133 I turn next to the question of whether the incorporation of MS 4200 and the survey field notes into the patent issued for the Cobban Placer created an easement by plat. I do not agree with all of the Court's analysis regarding our easement by plat jurisprudence. I will save most of these disagreements for another day, however, and focus on the two primary arguments that the Court advances to support its holding that no public easement by plat exists. The Court first asserts that the easement by plat doctrine does not create public easements. ¶ 61. The Court next determines that MS 4200 does not clearly manifest the United States's intent to grant or reserve a public easement. ¶ 62. I will address each objection in turn.

¶134 The Court rejects the notion that MS 4200 created a public easement across the Cobban Placer because it determines that easements by plat cannot create public

79

roadways. The Court reasons that none of our previous decisions have recognized the creation of public roadways. ¶ 61. Conversely, none of our previous easement by plat decisions has determined that easements by plat may not be public. *E.g. Loomis v. Luraski*, 2001 MT 223, 306 Mont. 478, 36 P.3d 862; *Pearson v. Virginia City Ranches Ass'n.*, 2000 MT 12, 298 Mont. 52, 993 P.2d 688; *Kelly v. Wallace*, 292 Mont. 129, 972 P.2d 1117 (1998); *Tungsten Holdings Inc. v. Parker*, 282 Mont. 387, 938 P.2d 641 (1997); *Ruana v. Grigonis*, 275 Mont. 441, 913 P.2d 1247 (1996); *Halverson v. Turner*, 268 Mont. 168, 885 P.2d 1285 (1994); *Bache v. Owens*, 267 Mont. 279, 883 P.2d 817 (1994). Nothing in those cases suggests any legal or logical reason to deduce such a conclusion.

¶135 Moreover, none of the easement by plat cases addressed a situation, such as the one presented here, where the easement in question was created pursuant to an offer to the public by the United States, to create a public highway. Cobban and Lewis located the Cobban Placer on the public domain in 1892. The Road existed across their proposed claim as Reese had located the Plymouth Rock and Plymouth Rock Extension Placer in 1889 and 1890. The Road provided the only access to these claims. "[P]arties are presumed to contract with reference to the condition of the property at the time of the sale, provided the marks are open and visible." *Godfrey v. Pilon*, 165 Mont. 439, 445, 529 P.2d 1372, 1375 (1974) (citing *Pioneer Mining Co. v. Bannack Gold Mining Co.*, 60 Mont. 254, 263, 198 P. 748, 751 (1921) (internal emphasis and quotation marks omitted).

¶136 The Road was open and visible in 1893 when the Cobban Placer was surveyed. *Godfrey*, 165 Mont. at 445, 529 P.2d at 1375. Cobban and Lewis would have been

familiar with the Road when they located the Cobban Placer in 1892 as the Road provided the only access across the public domain to it. *Godfrey*, 165 Mont. at 445, 529 P.2d at 1375. MS 4200 merely confirmed these facts. The proper filing of MS 4200 in the U.S. Surveyor General's Office on May 20, 1893, as required by law, put all future purchasers of the Cobban Placer on inquiry notice of the public easement created by the Road. *Halverson*, 268 Mont. at 172-73, 885 P.2d at 1288.

¶137 With respect to the Court's determination that MS 4200 does not clearly manifest the United States's intent to reserve a public easement, I would point to the Court's error in looking for the United States's intent in the patent itself transferring title of the Cobban Placer to Cobban and Lewis. ¶ 29. The plain language of R.S. 2477 provided the United States's express intent to grant a public easement. These public easements across the public domain encumbered future claimants of the public domain over which these public easements crossed. *Murray*, 7 Mont. at 68, 14 P. at 657. More importantly, the court in *Standage Ventures, Inc. v. State of Arizona*, 499 F.2d 248, 250 (9th Cir. 1974), derided as "palpably insubstantial" a claim that a public road had not been created pursuant to R.S. 2477 due to the absence of an express reservation in the landowner's patents. The court dismissed this argument "particularly since an official plat disclosing the easement was referred to in the patents and thereby incorporated by reference." *Standage Ventures, Inc.*, 299 F.2d at 250 (citing *United States v. Otley*, 127 F.2d 988, 993 (9th Cir. 1942)).

¶138 We know that the patent here likewise incorporated MS 4200 and the survey notes. ¶ 26; *Jefferis*, 134 U.S. at 194-95, 10 S. Ct. at 522. The District Court identified no fewer than eight deeds involving transfers of portions of the Cobban Placer between

1961 and 1998 that refer to MS 4200. MS 4200 and the survey notes identified the Road. Likewise the District Court identified five additional surveys that identified the Road. Each of these five surveys refers to MS 4200 or other surveys that refer to MS 4200. The Court's express concern for the peace of mind of "past, present, and future generations of Montana landowners," ¶ 67, rings hollow in light of the evidence in the whole record that should have put these Landowners on notice of the presence of a public easement across their property.

¶139 The Court cites *Leo Sheep* for the proposition that land titles have a special need for "certainty and predictability." ¶ 66, (quoting *Leo Sheep*, 440 U.S. at 687, 99 S. Ct. 1413.) The Court instead should heed the admonition in *Leo Sheep* to "recur to history of the times" when the United States in 1866 offered an express dedication of an easement across the public domain to members of the general public. *Leo Sheep*, 440 U.S. at 669, 99 S. Ct. 1405. A review of this history would confirm the United States's intent to offer an express easement to members of the general public, without any involvement or act by local officials, to create public easements across the public domain. *Moulton*, 67 Mont. at 510, 218 P. at 1055; *Murray*, 7 Mont. at 68, 14 P. at 656-57. Reese accepted that invitation when he located the Plymouth Rock in 1889 and the Plymouth Rock Extension Placer in 1890. He accessed these claims by traveling across the public domain on the Road. I dissent.

/S/ BRIAN MORRIS

Justices W. William Leaphart and John Warner join in the foregoing dissent.

/S/ W. WILLIAM LEAPHART

/S/ JOHN WARNER